Docket No. 107276.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

_____

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHERYL L. BARTELT, Appellant.

*Opinion filed March 24, 2011.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas and Garman concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justices Burke and Theis.

## OPINION

After a lawful traffic stop, a police officer performed a set-up procedure, which entailed ordering the driver, defendant, Cheryl L. Bartelt, to roll up her truck's windows and turn the ventilation system's blowers on high before a second officer conducted a canine sniff of the exterior of her truck. The dog alerted on both doors of the truck, and a subsequent search of the truck resulted in discovery of drug evidence. Defendant was arrested and charged with unlawful possession of methamphetamine (720 ILCS 646/60(b)(1) (West 2006)). She filed a motion to suppress the evidence recovered during the traffic stop. The circuit court of Adams County granted the

motion to suppress. The State filed an interlocutory appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2006). A majority of the appellate court reversed the circuit court's order suppressing the evidence. 384 Ill. App. 3d 1028. This appeal followed.

We are asked to determine whether the officers' actions in ordering defendant to roll up her windows and turn the blowers on high before conducting a dog sniff of the truck's exterior constituted an unreasonable search under the fourth amendment. We hold that it did not. Accordingly, we affirm the judgment of the appellate court, reverse the judgment of the circuit court, and remand to the circuit court for further proceedings consistent with this opinion.

BACKGROUND

The evidence introduced at the hearing on the motion to suppress can be summarized as follows. On the evening of July 29, 2006, Quincy police officer Mike Tyler, who had received information that defendant was a methamphetamine user, conducted surveillance of her apartment. At 6:45 p.m., he saw a pickup truck parked on the sidewalk in front of her apartment, ran the plates, and learned the truck was registered to her. At 8:15 p.m., he saw her and a man, later identified as Josh Miracle, come out of the apartment and place white trash bags in the back of the truck. Defendant got in the driver's seat and Miracle in the passenger seat. Defendant drove away, and Officer Tyler followed. He then alerted Quincy police officer Darin Kent, a member of the canine unit, that he intended to make a traffic stop and asked Officer Kent to conduct a dog sniff during the stop. Officer Tyler activated his lights when defendant pulled into a nearby gas station. He radioed Officer Kent that he had made the stop and provided the location.

Officer Tyler then approached defendant's truck and told her that she had violated the Illinois Vehicle Code by parking her truck on the sidewalk in front of her apartment for over an hour and a half. He asked for and obtained her driver's license and insurance information and returned to his squad car to conduct a computer check of this information. However, within approximately 20 seconds after he returned to his car, and within three minutes of the initial stop, Officer Kent arrived at the scene with his narcotics detection dog, Max.

-2-

Officer Kent is a certified canine handler for the department's street crimes unit. He follows the format for dog sniffs taught by the Illinois State Police canine unit and taught his fellow officers to follow the same procedures. One such procedure is a set-up procedure, which is done before the dog is taken around the vehicle. The set-up procedure entails telling the driver to turn off the engine; turn the key on auxiliary, which allows the blowers to work; turn the blowers on high; roll up the windows; and close the doors. The purpose of the set-up procedure is to force air inside the vehicle out through the seams, where the dogs are trained to sniff.

Officer Kent asked Officer Tyler to set up defendant's truck for the dog sniff. Officer Tyler reapproached defendant, who was sitting in her truck, and told her to roll up her windows and turn the blowers on high. She complied, and Officer Kent conducted the dog sniff.

Officer Kent begins a dog sniff by walking the dog parallel to the vehicle, beginning at the front and proceeding counterclockwise for two passes. The dog signals an alert by turning perpendicular to the vehicle. In addition, the dog's breathing will change, and his sniffing will intensify or become more rapid. Finally, the dog will put a paw out, look at the handler, and start barking. Probable cause is obtained through a dog's positive alert.

Officer Tyler had returned to his squad car to run defendant's information but had not started writing the ticket when Officer Kent informed him that Max had alerted on both doors of the truck. Officer Tyler went back to defendant's truck and told her and Miracle to exit the truck. The officers obtained consent from both defendant and Miracle to search their persons. Nothing was found.

A subsequent search of the truck and defendant's purse, which was inside, revealed a bag containing a digital scale with white powder residue; several burnt pieces of tinfoil; and a pen casing, with a burnt end and a powder substance on the inside. Defendant was arrested and charged with unlawful possession of methamphetamine (720 ILCS 646/60(b)(1) (West 2006)).

Defendant filed a motion to suppress the evidence recovered during the traffic stop. During argument on the motion, defense counsel stated that before the hearing, he was unaware that a set-up procedure was used to facilitate the dog sniff. Therefore, in his

suppression motion, counsel had argued that Officer Tyler's stop of defendant was an illegal seizure because he had manipulated the timing of the traffic stop by waiting for defendant to get into her truck and drive off, instead of knocking on the door of her apartment and issuing her a citation. Counsel had also focused on Officer Tyler's admission that he had intended to search the truck, hoping to find more incriminating evidence.

The circuit court rejected defendant's argument regarding Officer Tyler's motivation. However, the court found the set-up procedure more interesting, noting that this was the first instance the court, the prosecutor, or defense counsel had encountered such a procedure. Because the court was curious as to whether the officers had the authority to direct defendant to roll up her windows and turn the blowers on high, it continued the matter to allow briefing on the issue.

When the hearing resumed, the parties informed the court that they agreed that the United States Supreme Court's decision in *Illinois v. Caballes*, 543 U.S. 405 (2005), authorizes police to conduct a dog sniff and that a dog sniff ordinarily is not a search. They also agreed that there was no undue delay occasioned by the dog sniff, and no one disputed Max's qualification to perform the dog sniff.

The parties disagreed, however, as to whether the officers had the authority to order defendant to comply with the set-up procedure before conducting the dog sniff. Although the propriety of the set-up procedure appeared to be a matter of first impression in Illinois, the State cited to *United States v. Ladeaux*, 454 F.3d 1107 (10th Cir. 2006), as being factually analogous, to the extent that the defendant challenged the validity of the use of a set-up procedure identical to that employed here during a routine traffic stop. However, although the circuit court and the parties discussed *United States v. Ladeaux*'s focus on whether police mandated compliance with the procedure–which would render it an additional seizure–they noted that the Tenth Circuit had remanded the cause to the district court for this determination and that the results had not yet been reported.

As an outgrowth of this discussion, the State conceded that because Officer Tyler could not recall exactly how he phrased his statement to roll up the windows and turn on the blowers, and given that Officer Kent testified that he instructed his fellow officers not to give motorists a choice of complying, the court could assume that

-4-

Officer Tyler told defendant to do it. Nevertheless, the State contended that this was not controlling, asserting that because the set-up procedure is a minimally intrusive, "recognized method of instruction," it did not violate the fourth amendment.

The circuit court granted defendant's motion to suppress. Initially, the court found that the traffic stop was justified based on defendant's violation of the Illinois Vehicle Code. In addition, the court found that the stop was not unreasonably extended by the calling of the canine unit to the scene. The court stated that the issue was whether defendant's fourth amendment rights were violated by the officers instructing her to roll up her windows and turn the blowers on high. The circuit court held that the officers had no probable cause to search the truck before Max alerted.

The circuit court found *Illinois v. Caballes* distinguishable because, in that case, the dog sniff occurred on the exterior of the vehicle. In the present case, although Max alerted from the outside of defendant's truck, he "had some help" in that the "air from the interior was being forced out of the truck by the turned-up blowers," and "[t]he blowers were turned up by the defendant, but only upon the demand of the officers." The court concluded that by requiring defendant to roll up the windows and turn the blowers on high, the officers, in effect, moved and manipulated the air within the truck that would not otherwise have been subject to Max's plain smell. Although the court recognized that Max was still outside defendant's truck when he alerted, the court found that, in effect, Max was placed inside the truck by the officers. The circuit court concluded that directing defendant to roll up her windows and turn the blowers on high turned the dog sniff into an unreasonable search under the fourth amendment.

The State filed an interlocutory appeal. The State argued that the circuit court's decision should be reversed because the officers' orders to roll up the windows and turn the blowers on high did not change the nature of the dog sniff to an unlawful search because (1) Max remained outside the truck and (2) defendant had no legitimate expectation of privacy in the potentially incriminating odors emanating from her lawfully stopped truck.

Initially, the appellate court noted that the arguments on appeal were limited to the set-up procedure employed by the officers before the dog sniff and that no other portion of the stop was at issue. 384

-5-

Ill. App. 3d at 1031. The appellate court stated the issue as "whether the police order to defendant to roll up her windows and turn the blower to high intruded upon a legitimate privacy interest and constituted a search under the fourth amendment." *Id.* at 1031-32.

A divided appellate court reversed the circuit court's suppression order. *Id.* at 1036. Upholding the validity of the set-up procedure, the majority found it "to be a practical tool of police work that does not interfere with the reasonable expectation of privacy in the interior of defendant's [truck]." *Id.* at 1035. The appellate court noted that, under *Illinois v. Caballes*, a dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no one has the right to possess does not violate the fourth amendment. *Id.* The appellate court concluded as follows:

> "The set-up procedure is quick and nonintrusive; thus, it does not impermissibly lengthen the duration of the stop. It also ensures the canine remains outside the vehicle during the sniff, as both the doors and windows are closed. This is a practical technique that balances a defendant's reasonable expectation of privacy with the opportunity to allow law enforcement to ferret out crime. No fourth-amendment violation occurs when an officer lawfully investigating a traffic violation orders the occupant to roll up the windows and turn on the blowers to facilitate a dog sniff." *Id.* at 1035-36.

The dissenting justice would have affirmed the circuit court's suppression order, concluding as follows:

> " 'Plain view' includes items that would be within the 'plain smell' of a dog at the exterior of a vehicle. In the present case, the officer impermissibly went beyond what was in plain view and ordered the occupants of the vehicle to engage in testing." *Id.* at 1036 (Cook, J., dissenting).

This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

## ANALYSIS

The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.,

amend. IV; accord Ill. Const. 1970, art. I, §6.[1] Thus, the guarantees of the fourth amendment attach where a "search" or "seizure" takes place. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). In contrast, a "seizure" occurs when "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

A circuit court's ruling on a motion to suppress evidence is reviewed under the two-part test adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Harris*, 228 Ill. 2d 222, 230 (2008). The circuit court's factual findings may be rejected only if they are against the manifest weight of the evidence. *Id.* However, the reviewing court may assess the established facts in relation to the issues presented and may draw its own conclusions in deciding what relief, if any, should be granted. *Id.* Accordingly, the circuit court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*. *Id.*

The issue presented in this appeal is narrow. There is no dispute regarding the circuit court's factual finding that the initial traffic stop was justified by Officer Tyler's observation of defendant's violation of the Illinois Vehicle Code (625 ILCS 5/11–1303(a)(1)(b) (West 2006) (no person shall stop, stand, or park a vehicle on a sidewalk)), and that the seizure, therefore, was reasonable. See *Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

In addition, it is undisputed that the officers had the authority to conduct an exterior dog sniff of defendant's truck during the traffic

---

[1]Defendant limits her argument to the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and does not contend that the search and seizure provision of article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, §6) provides broader protection than the fourth amendment. Accordingly, we confine our analysis to defendant's fourth amendment claim.

stop and that the dog sniff itself was not a search subject to the fourth amendment. See *Illinois v. Caballes*, 543 U.S. at 408-10 (holding that a suspicionless dog sniff conducted during a lawful traffic stop that reveals no information other than the location of a substance no individual has any right to possess is not a search subject to the fourth amendment).

Finally, there is no dispute that Officer Tyler ordered defendant to comply with the set-up procedure. As noted, the State conceded in the circuit court that Officer Tyler ordered defendant to perform the procedure and did not give her the option of refusing to comply.

The only issue on appeal is whether the officers' actions in ordering defendant to roll up her windows and turn the blowers on high before conducting the dog sniff of the truck's exterior constituted an unreasonable search under the fourth amendment. This seems to be an issue of first impression nationwide because the parties have not cited, nor has our research revealed, any decisions that have addressed the issue.

The dissent would like us to recharacterize the issue as whether the officers' actions in ordering defendant to roll up her windows and turn the blowers on high before conducting the dog sniff of the truck's exterior constituted an unreasonable *seizure* under the fourth amendment. We decline to do so because it is clear that, in her briefs and oral arguments before this court, defendant argues that the officers' actions in ordering her to roll up her windows and turn the blowers on high before conducting the dog sniff of the truck's exterior constituted an unreasonable *search*, not an unreasonable *seizure*.

For example, in the "General Principles" portion of her brief, defendant includes exclusively fourth amendment *search* principles. She explains that "[a] search for purposes of the [f]ourth [a]mendment occurs when government officials violate an individual's legitimate expectation of privacy." Appellant's Br. 18. She sets forth general "expectation of privacy" principles and explains what level of privacy can reasonably be expected in relation to an automobile. Appellant's Br. 18-21. She states that "[a]t issue here is whether the police 'set up' procedure created an unreasonable *search* under the fourth amendment." (Emphasis added.) Appellant's Br. 20-21. Notably, she does not explain when a "seizure" occurs for purposes of the fourth amendment.

Similarly, the "Analysis" section of her brief is devoted *exclusively* to whether the set-up procedure resulted in an unconstitutional *search* of the interior of her truck. She devotes her entire discussion to fourth amendment *search* cases and to arguing that (1) she had a reasonable expectation of privacy in the interior of her truck and that (2) the set-up procedure therefore resulted in an unconstitutional *search* of her truck. Even her brief discussion of *United States v. Ladeaux* leads her to conclude that "[t]he resulting sniff thus became a *search* subject to the fourth amendment." (Emphasis added.) Appellant's Br. 22. She did not argue that the officer's order to roll up the windows and turn the blowers on high amounted to a *seizure* for fourth amendment purposes–that is, that the order communicated to her that she was not free to decline the request or otherwise terminate the encounter. See *Bostick*, 501 U.S. at 439.

Although she asserts in the very last paragraph of the "Analysis" section of her brief that "Officer Tyler impermissibly acted by turning the traffic stop into an illegal seizure by ordering [her] to place the vehicle on auxiliary power, to turn the vents to high, and to keep all doors and windows closed" (appellant's br. 27), she offers no support for that assertion, either factually or legally. In fact, the *only* authority that she cites in support of that assertion is the United States Supreme Court's pronouncement in *Horton v. California*, 496 U.S. 128 (1990), that "a '*search*' compromises an individual interest in privacy." (Emphasis added.) Appellant's Br. 27. Even here, then, she is making a *search* argument. Reading the paragraph as a whole, and given that her sole citation is to a fourth amendment *search* principle, we assume that what she is attempting to argue is that, as a result of the unlawful *search*, the otherwise lawful seizure was transformed into an unlawful seizure. This is very different from the seizure argument addressed in the dissent.

The final section of the State's brief is titled "Defendant Makes No Argument That The Set-Up Procedure Was A Seizure." Appellee's Br. 26. This section is a direct response to the isolated sentence described above, and the State obviously included it to avoid any possibility that this court would use that sentence as a basis for treating this as a seizure case rather than a search case. Notably, in her reply brief, defendant does not contest or even respond to this argument, offering instead only the same "expectation of privacy" and

"search" arguments that she offered in her opening brief. While not binding, such silence certainly underscores what is otherwise apparent–that defendant is not arguing that the orders relating to the set-up procedure amounted to an unlawful seizure.

Finally, at oral argument before this court, defense counsel made it abundantly clear that defendant's argument is that the set-up procedure was an unlawful *search*, not an unlawful *seizure*. Accordingly, we confine our analysis to defendant's *search* argument and save the seizure analysis for a case where the issue is properly before us and has been fully briefed and argued.

As stated previously, "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113. Consequently, "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Caballes*, 543 U.S. at 408 (quoting *Jacobsen*, 466 U.S. at 123).

The Supreme Court has held that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.' " *Id.* (quoting *Jacobsen*, 466 U.S. at 123). The Court explained that "the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.' " *Id.* at 408-09 (quoting *Jacobsen*, 466 U.S. at 122). The Court noted that, in *United States v. Place*, 462 U.S. 696 (1983), it "treated a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item.' " *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707).

In *Illinois v. Caballes*, the Court held that "the use of a well-trained narcotics-detection dog–one that 'does not expose non-contraband items that otherwise would remain hidden from public view,' [citation]–during a lawful traffic stop generally does not implicate legitimate privacy interests." *Id.* The Court explained:

> "In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable

infringement.

> *** A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Caballes*, 543 U.S. at 409-10.

Similarly, in the present case, the dog sniff was conducted on the exterior of defendant's truck while she was lawfully seized for a traffic violation. Even though the officers ordered her to roll up her windows and turn the blowers on high before they conducted the dog sniff, any intrusion on her "privacy expectations does not rise to the level of a constitutionally cognizable infringement." See *id.* at 409. The dog sniff revealed "no information other than the location of a substance that no individual has any right to possess." See *id.* at 410. Accordingly, under *Illinois v. Caballes*, the dog sniff in the present case was not a search subject to the fourth amendment because it did not " 'compromise any legitimate interest in privacy.' " See *id.* at 408 (quoting *Jacobsen*, 466 U.S. at 123).

The set-up procedure at issue in this case is analogous to the luggage "prepping" procedure approved by the Fifth Circuit in *United States v. Viera*, 644 F.2d 509 (5th Cir. 1981). In *United States v. Viera*, Drug Enforcement Administration agents "prepped" the defendants' suitcases before a dog sniff by pressing them lightly with the hands and slowly circulating the air, the purpose of which was to procure a scent from the bags. *Viera*, 644 F.2d at 510. The Fifth Circuit rejected the defendants' argument that the "prepping" procedure was a search in violation of the fourth amendment, holding that a dog sniff is not a search within the meaning of the fourth amendment and that a light press of the hands along the outside of the suitcases was not sufficiently intrusive to require a different result. *Id.*

Similarly, in the present case, a dog sniff is not a search within the meaning of the fourth amendment, and ordering defendant to roll up her windows and turn the blowers on high before conducting the dog sniff was not sufficiently intrusive to require a different result. See *id.*

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is

affirmed.

Affirmed.

JUSTICE FREEMAN, dissenting:

This appeal squarely presents the question of whether a police officer's order to a driver, during a routine traffic stop, to perform a "set-up" procedure to facilitate a canine sniff for narcotics, is an unreasonable seizure which violates the fourth amendment. It is my view that it is. Despite the fact that this precise issue was litigated by the parties in the circuit court, and even though the majority's own recitation of the factual background and procedural history of this cause repeatedly references seizure principles, my colleagues decline to analyze this appeal in the context of whether defendant was subjected to an unreasonable seizure. Instead, they review the propriety of the police action by inquiring whether the "ordering" of defendant to perform the set-up procedure is "an unreasonable search." Slip op. at 8. Using this inappropriate analytical framework, the majority holds that there is no constitutional violation. As I agree with neither the majority's analysis nor the result, I respectfully dissent.

I. General Fourth Amendment Principles

The general principles of analysis of claims brought under the fourth amendment are familiar. The fourth amendment to the United States Constitution guards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, §6. Accordingly, the protections of the fourth amendment attach where a "search" or "seizure" occurs. A "search" takes place when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Because a search affects privacy interests, a search which is reasonable at its inception may become unreasonable "by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 17-18 (1968).

In contrast, a "seizure" occurs when the conduct of police "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *People v. Luedemann*, 222 Ill. 2d 530, 550 (2006). More specifically, a person may be seized for purposes of the fourth amendment where a law enforcement officer makes a show of authority and there is submission to that show of authority (*Brendlin v. California*, 551 U.S. 249, 254 (2007)), including where an officer orders a motorist to comply with instructions, such as to open a car door or roll down a window. *Luedemann*, 222 Ill. 2d at 550. It is well settled that a traffic stop entails a seizure of the driver. *Brendlin*, 551 U.S. at 255.

Because seizures affect personal liberty interests, including the freedom of movement and the possession of property (see *Delaware v. Prouse*, 440 U.S. 648, 657 (1979)), an investigative detention must last "no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In addition, the investigative means used must be "the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Id.*

Once it is determined that a search or seizure has taken place, in order to pass constitutional muster, it must be "reasonable." Indeed, the touchstone of fourth amendment analysis "is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (quoting *Terry*, 392 U.S. at 19). "Reasonableness" depends upon "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

When, as here, a circuit court grants a motion to suppress evidence based upon a violation of the fourth amendment, that ruling is reviewed under the two-part test adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Harris*, 228 Ill. 2d 222, 230 (2008). The circuit court's factual findings are upheld unless they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). The reviewing court then assesses the established facts in relation to the issues presented and may draw its own conclusions in deciding what relief, if any,

should be granted. *Harris*, 228 Ill. 2d at 230. Accordingly, this court reviews *de novo* the ultimate legal question of whether suppression is warranted. *Luedemann*, 222 Ill. 2d at 542-43.

II. Factual Background

As stated, in determining whether an individual has been "seized" for fourth amendment purposes, the inquiry pivots on whether the conduct of police would have communicated to a reasonable person that she was not free to decline the officers' requests or otherwise terminate the encounter. Also, as stated, a person's submission to a show of authority indicates that the person has been seized. These principles of seizure analysis are repeatedly referenced in the "Background" section of the majority opinion, wherein my colleagues recount the course of these proceedings in the circuit court. The transcript of the hearing on defendant's motion to suppress reveals that the parties and the circuit court grappled with the issue of whether the officer's order to defendant to engage in the set-up procedure during the traffic stop constituted an additional seizure, and, if so, whether that seizure was reasonable.

For example, the majority notes that it was during the suppression hearing that the parties and the court first became aware of the use of the set-up procedure by police. According to the majority, because the circuit court found the procedure "interesting" (slip op. at 4), and because it was "curious as to whether the *officers had the authority to direct defendant* to roll up her windows and turn the blowers on high" (emphasis added) (slip op. at 4), it continued the matter to allow briefing on this specific issue. I note that the majority itself indicates that the circuit court's "interest" and "curios[ity]" was centered upon whether it was proper for the officer to *order* defendant to set-up the vehicle to facilitate the dog sniff, as well as upon the resulting effect of defendant's submission to this show of authority.

The majority further recounts that when the hearing resumed, the parties disagreed on the critical issue of "whether the officers *had the authority to order defendant to comply* with the set-up procedure before conducting the dog sniff." (Emphasis added.) Slip op. at 4. Again, I note that this clearly shows that the question debated in the circuit court involved seizure analysis, as it concerned the officer's

show of authority against defendant by commanding her to comply with the set-up procedure, the submission of defendant to this show of authority, and whether this show of authority constituted an additional seizure which was reasonable.

The majority further recounts that although the parties and the circuit court agreed that the question of whether the set-up procedure comported with the fourth amendment appeared to be a matter of first impression in Illinois, the State relied upon a ruling of the federal Court of Appeals for the Tenth Circuit, *United States v. Ladeaux*, 454 F.3d 1107 (10th Cir. 2006), as being factually analogous. Slip op. at 4. The majority relates that "the circuit court and the parties discussed *United States v. Ladeaux*'s focus on *whether police mandated compliance with the procedure–which would render it an additional seizure*." (Emphasis added.) Slip op. at 4. Thus, the majority itself tells us that the parties, as well as the circuit court, applied *Ladeaux* in the context of whether the officer's order to defendant to perform the set-up procedure amounted to an additional seizure, and, if so, whether it was reasonable. The record reveals–and the majority acknowledges–that as a direct outgrowth of this discussion of seizure principles, the State conceded before the circuit court that Officer Tyler *ordered* defendant to comply with the set-up procedure, and that she had *no option of refusal.* Slip op. at 4.

The majority further observes that, in granting defendant's motion to suppress, "[t]he [circuit] court stated that the issue was whether defendant's fourth amendment rights *were violated by the officers instructing her* to close the truck's windows and doors and turn the blowers on high." (Emphasis added.) Slip op. at 5. In agreeing with defendant that her fourth amendment rights were violated, the circuit court held that "*the directing of the defendant* to close the truck's windows and doors and to turn the blower on high" was unreasonable. (Emphasis added.)

A divided appellate court reversed the circuit court's suppression order. 384 Ill. App. 3d 1028. Although the majority appeared to treat this as a "search" rather than a "seizure" case, I note that the majority used seizure language in holding that "[n]o fourth-amendment violation occurs when an officer lawfully investigating a traffic violation *orders the occupant* to roll up the windows and turn on the blowers to facilitate a dog sniff." (Emphasis added.) 384 Ill. App. 3d

-15-

at 1036. In addition, seizure analysis was also used by the dissenting justice, who asserted that "[a] police officer who has stopped a vehicle for a traffic violation *does not have unbridled authority to order* and conduct chemical tests," and that under these facts it was impermissible for the officer to "*order[ ] the occupants* of the vehicle to engage in testing." (Emphases added.) 384 Ill. App. 3d at 1036 (Cook, J., dissenting).

### III. The Majority's Analysis

In the instant appeal, three major points are undisputed. First, there is no dispute regarding the circuit court's factual finding that the initial traffic stop was justified by Officer Tyler's observation of defendant's violation of the Illinois Vehicle Code (625 ILCS 5/11–1303(a)(1)(b) (West 2006) (no person shall stop, stand or park a vehicle on the sidewalk)), and that this initial seizure, therefore, was reasonable. As stated, it is well settled that the temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the fourth amendment. *Prouse*, 440 U.S. at 653. To comport with the fourth amendment, this seizure must be "reasonable" under the circumstances. Generally, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996).[2]

Second, it is also undisputed that the Quincy officers had the authority to conduct an exterior canine sniff of defendant's vehicle during the traffic stop and that the sniff itself did not violate the fourth amendment.[3] In *Illinois v. Caballes*, 543 U.S. 405 (2005), the

---

[2]But see *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) (parking violation was a violation of the traffic laws and thus justified a stop on probable cause; however, "where an observed parking violation is not ongoing, an officer is required to effect a stop based upon this conduct within a reasonable period of time," otherwise "the existence of probable cause is said to have become stale").

[3]I note that it is also undisputed that there was no undue delay occasioned by the sniff, and that the canine Max was qualified to perform the sniff.

Supreme Court held that a suspicionless dog sniff conducted during a routine traffic stop does not implicate rights protected by the fourth amendment. *Id.* at 409; see also *People v. Bew*, 228 Ill. 2d 122, 130 (2008).

Finally, there is no dispute that Officer Tyler demanded that defendant comply with the set-up procedure. As noted, the State conceded in the circuit court that Officer Tyler ordered defendant to perform the procedure, and that she had no option to refuse compliance.

What *is* in dispute in this case–as the majority's recitation of the factual background amply demonstrates–is whether the officer's order to defendant to comply with the set-up procedure during the traffic stop constituted an additional seizure, and, if so, whether that seizure was reasonable. Nevertheless, despite its repeated recitation that the proceedings in the circuit court revolved around seizure principles, the majority frames the issue on appeal as whether the officers' order to defendant to perform the set-up procedure constituted an unreasonable *search* under the fourth amendment. Slip op. at 8. The majority explains that it confines its analysis to search principles because defendant limits her argument to the issue of whether the set-up procedure used in this case constituted an unreasonable search under the fourth amendment and does not argue that the set-up procedure constituted an unreasonable seizure. Slip op. at 8.

In her brief to this court, defendant did argue that the officer's command to engage in the set-up procedure was an unreasonable *seizure*, maintaining that "[i]n the instant case, Officer Tyler impermissibly acted by turning the traffic stop into an illegal *seizure* by ordering Ms. Bartelt to place the vehicle on auxiliary power, to turn the vents to high, and to keep all doors and windows closed." (Emphasis added.) Although this precise argument was not fully developed, the fact remains–as repeatedly acknowledged by the majority in the "Background" section of its opinion–that seizure concepts, principles and arguments were raised and considered in the circuit court. As the issue presented in this appeal is novel, it is therefore not surprising that both parties–as well as the courts–have struggled in defining the precise contours of the proper arguments and analysis. The fact that this appeal involves a fourth amendment question has added to this conundrum, as that provision is "more

-17-

practical than theoretical," and "[b]oth the language of the Amendment, which prohibits 'unreasonable searches and seizures,' and the decisions of the [United States Supreme] Court interpreting it are purposely imprecise." *United States v. Johnson*, 599 F.3d 339, 342 (4th Cir. 2010). Indeed, the Court's fourth amendment decisions "reflect a preference for case-by-case analysis, informed judgment, and an examination of the entire factual picture over any 'neat set of legal rules.' " *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

It is well settled that this court may affirm the judgment of the circuit court on any basis contained within the record. *People v. Horrell*, 235 Ill. 2d 235, 241 (2009). Because the record unquestionably establishes that seizure principles were squarely raised and considered in the circuit court, and the majority's own opinion makes it clear that the issue presented by this appeal is whether the order to defendant to perform the set-up procedure constituted an additional seizure which was reasonable, I believe that the seizure question is properly before us and that the resolution of this appeal rests upon application of seizure principles. Although the majority decides to "save the seizure analysis" for another day (slip op. at 10), I question why this defendant is penalized and the violation of her rights is unredressed in favor of deferring our examination of an issue which is squarely presented by this appeal.

It is precisely because the majority frames the issue as whether the officer's order to defendant to perform the set-up procedure constituted an unreasonable *search*–rather than seizure–that the majority can therefore assert that "[t]his seems to be an issue of first impression nationwide because the parties have not cited, nor has our research revealed, any decisions that have addressed the issue." Slip op. at 8.

As noted, however, the *identical* factual situation has been addressed in a case which was cited by the State in the circuit court, extensively discussed during those proceedings, and also cited and debated by the parties in their briefs to this court. In *United States v. Ladeaux*, 454 F.3d 1107 (10th Cir. 2006), the use of a similar set-up procedure was challenged by the defendant as violative of the fourth amendment. Although the procedural posture of *Ladeaux* prevented that court from reaching the merits of the defendant's claim, that opinion's analysis is instructive. The majority, however, ignores this

case–which is directly on point–presumably because it invokes *seizure*, rather than *search*, principles.

In *Ladeaux*, the defendant was a passenger in a car stopped for traffic violations. Because the officer believed the driver was unduly nervous, he requested a narcotics detection dog be brought to the scene based upon his "hunch." When the dog arrived, the officer–similar to the matter at bar–instructed that the car's windows be rolled up and the vents turned on to force the air out of the vehicle prior to the sniff. After the canine gave a positive alert, the vehicle was searched and narcotics were discovered. The defendant was arrested. *Ladeaux*, 454 F.3d at 1109.

The defendant argued, *inter alia*, that the officers' instruction to roll up the windows and turn on the vents impermissibly expanded the scope of the initial traffic stop, as the officer had no valid basis to order performance of these actions. However, because the district court failed to consider whether the evidence obtained during the stop should be suppressed based upon the officer's conduct, the Tenth Circuit remanded the cause to allow this specific determination. *Ladeaux*, 454 F.3d at 1110. The court provided the following instructions on remand, requiring the district court to determine whether the officer's actions constituted an unreasonable seizure because he issued a mandatory command to perform the procedure rather than merely request compliance:

> "[T]he district court must initially determine whether there was a violation of Ladeaux's Fourth Amendment rights. ***
>
> *** [T]he character of [the officer's] request is unclear. *** [T]he district court must consider whether the request required compliance or merely solicited cooperation. If [the officer] requested the windows be closed and the vents opened in such a way that an objective person would have felt 'free to decline the officers' request'–even in the absence of reasonable suspicion that the vehicle contained narcotics–we doubt that the Fourth Amendment would be implicated at all." *Ladeaux*, 454 F.3d at 1111-12.

Shortly after the Tenth Circuit remanded the cause, however, the district court granted Ladeaux's motion to withdraw his motion to

suppress.[4] Although Ladeaux's withdrawal of his suppression motion ended the cause before the district court had an opportunity to determine the validity of the officer's actions, this does not lessen the guidance offered by the Tenth Circuit's opinion.

Thus, contrary to the majority's statement that "the parties have not cited *** any decisions that have addressed" the issue presented by this appeal, *Ladeaux* addressed the precise factual scenario presented in the matter before us: whether a motorist is unreasonably seized under the fourth amendment as a result of performing the "set-up" procedure as part of a routine traffic stop. I agree with *Ladeaux* that for purposes of determining whether the actions of police violated the fourth amendment, the pivotal inquiry is whether the officer demanded that the defendant comply with the set-up procedure or merely requested compliance so that " ' 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Luedemann*, 222 Ill. 2d at 550 (quoting *Bostick*, 501 U.S. at 436). I note that this inquiry was also of concern to the circuit court, which specifically questioned whether police, during a routine stop, have the authority to demand that a motorist perform the procedure.

Applying this analytical framework to the instant appeal, I observe, as an initial matter, that after stopping defendant based upon her violation of the Vehicle Code, Officer Tyler began the encounter by requesting defendant's identification and proof of insurance. It is well settled that it is proper for an officer to request identification during a traffic stop, as such request is "facially innocuous," neither suggesting official interrogation nor increasing the confrontational nature of the encounter. *Harris*, 228 Ill. 2d at 248-49; see also *Luedemann*, 222 Ill. 2d at 549. In addition, I note that an officer may ask to see a driver's license, proof of insurance and vehicle registration. *People v. Bradley*, 292 Ill. App. 3d 208, 211 (1997). We have also held that a warrant check of all occupants of a lawfully

---

[4]I note that in its brief to this court, the State attaches Ladeaux's motion, his supporting affidavit, and the court order. It appears that Ladeaux was advised by counsel that it was unlikely that he had standing to challenge the procedure because, as a passenger, he was not the person who took action in response to the instructions of the officer.

-20-

stopped vehicle does not violate the fourth amendment, as a warrant is a matter of public record in which an individual has no reasonable expectation of privacy. *Harris*, 228 Ill. 2d at 237.

I further note that the Supreme Court has held repeatedly that mere questioning of an already-seized individual does not constitute an additional seizure within the meaning of the fourth amendment, as long as there is no compulsion to answer, *i.e.*, "as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991); see also *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (even though officers had no reasonable suspicion, they could ask suspect her name, date and place of birth, and immigration status); *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 186 (2004) ("[Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops."); *United States v. Drayton*, 536 U.S. 194, 200 (2002) (a police officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen).

Finally, as noted, there also is no question that under *Caballes,* the officers could validly conduct a suspicionless, unaided canine sniff of the exterior of defendant's vehicle during the traffic stop. It is upon this uncontested point in *Caballes,* however, that the majority focuses its analysis, principally owing to the fact that the majority has forced a seizure case into a "search" framework, and *Caballes* is a search case. Thus, the majority proceeds as if the performance of the *dog sniff* is a contested issue, which it is not. To this end, the majority notes that, just as in *Caballes*, the dog sniff here was performed on the outside of the vehicle, and "[e]ven though the officers ordered her to roll up her windows and turn the blowers on high," any intrusion into defendant's privacy "does not rise to the level of a constitutionally cognizable infringement." Slip op. at 11. The majority thus arrives at the unremarkable, uncontested and well-settled conclusion that under *Caballes*, "the dog sniff in the present case was not a search subject to the fourth amendment because it did not 'compromise any legitimate interest in privacy.' " Slip op. at 11. The majority thus answers a question not presented by this appeal, and declines to address the question squarely raised in this case.

In fact, the analysis conducted by the majority was flatly rejected in *Ladeaux*. The *Ladeaux* opinion noted that the government had

urged that court to hold that *Caballes* compelled the conclusion that under the facts presented, no fourth amendment violation occurred. The court, however, found any argument premised upon *Caballes* inapposite, explaining: "The salient difference between *Caballes* and this case *** is that there was no order in *Caballes* comparable to [the officer's] request directed at the occupants of the vehicle in this case. Ladeaux objects not to the dog-sniff, but rather to the request; *Caballes* simply does not reach this question." *Ladeaux*, 454 F.3d at 1110 n.3.

I agree with *Ladeaux*. Under the facts presented in both *Ladeaux* and in this appeal, the police went further than the officers in *Caballes*: *they ordered defendant to assist them* in facilitating the canine sniff by demanding that she turn the vehicle to auxiliary power, close the windows and place the blowers on high to force the air from the inside of her truck to the outside of the vehicle. There also is no question that the officers demanded defendant's compliance in the midst of what was an already coercive environment, wherein defendant was confronted by two officers and a narcotics canine, and was seated in a vehicle which was parked in front of two police squad cars arranged in a "T" formation. Because the officers' actions subsequent to the initial stop unquestionably "communicated to a reasonable person that [she] was not free to decline the officers' requests or otherwise terminate the encounter" (*Bostick*, 501 U.S. at 439), I conclude that the officer's order to defendant to comply with the set-up procedure constituted an additional seizure. Accordingly, the reasonableness of this additional seizure must be assessed.

As stated, the reasonableness of a particular law enforcement practice is judged by balancing its promotion of legitimate governmental interests against its intrusion on fourth amendment interests. *Prouse*, 440 U.S. at 654 (and cases cited therein); *Mimms*, 434 U.S. at 109 (quoting *Brignoni-Ponce*, 422 U.S. at 878). Examination is first made of that side of the balance which supports the interests of the State in ordering motorists to perform the set-up procedure as a matter of course during all traffic stops. The State has proffered nothing in support of police making this demand of all drivers, including whether this procedure promotes legitimate law enforcement purposes, and to what extent–if any–it enhances the ability of the canine to find contraband that would not have been

discoverable through a routine, unaided exterior canine sniff. Further, when the State was questioned during oral argument regarding the silence of the record on this point, counsel candidly admitted that "we do not know the value of the procedure." Based upon these facts, the State has offered no justification to support police demanding that motorists perform the set-up procedure during routine traffic stops. Because there is nothing to balance against the intrusion to defendant's personal liberty interests and her right to be free from arbitrary interference by police, it necessarily follows that the set-up procedure is unreasonable and constitutionally infirm.

Indeed, it is based upon this significant balance in favor of defendant that the State's analogy between the order to defendant to perform the set-up procedure and an officer's order to occupants to exit the vehicle during a traffic stop fails. In its brief to this court, the State draws this analogy by relying upon the decisions of the United States Supreme Court in *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997), and *Mimms*, 434 U.S. at 111, which hold that the fourth amendment is not violated where police order occupants out of their vehicles as a matter of course during traffic stops. Notably, both *Mimms* and *Wilson* begin their analysis with the premise that an order by police to a motorist to exit the car is an additional intrusion into his or her personal liberty–in other words, a *seizure*. *Mimms*, 434 U.S. at 111; *Wilson*, 519 U.S. at 414-15. Thus, the critical question in these cases was whether the additional seizure was reasonable under the fourth amendment. In *Mimms*, the Supreme Court's holding that the additional seizure was reasonable was animated by the significant balance of interests in favor of the State. Unlike in the matter before us–where the State has proffered no evidence to support the police order to engage in the set-up procedure–the Court in *Mimms* held that the State's justification for the order to exit the vehicle was to ensure officer safety, an interest "both legitimate and weighty." *Mimms*, 434 U.S. at 110. When balanced against the public's substantial interest in officer safety, the additional intrusion into the driver's personal liberty occasioned by such order was found to be "*de minimis*." *Mimms*, 434 U.S. at 111; accord *Wilson*, 519 U.S. at 413-15 (extending *Mimms* to uphold validity of police order to passengers to exit vehicle during traffic stop, as "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the

-23-

stopped car," and "the additional intrusion on the passenger is minimal").

As explained, because it is my view that this appeal should be analyzed using seizure principles, I disagree with the majority's use of search analysis. However, even if I were to agree that it is appropriate to use search principles, I would nevertheless be unable to join the majority's opinion.

In the penultimate paragraph of the majority's analysis, my colleagues analogize the set-up procedure used in this case to a luggage "prepping" procedure approved by the federal Court of Appeals for the Fifth Circuit in *United States v. Viera*, 644 F.2d 509 (5th Cir. 1981). There, a bus driver became suspicious when two passengers boarded his bus with suitcases which were unusually heavy and in which he observed bags of pills and white powder. The driver alerted Drug Enforcement Administration agents, who conducted a dog sniff of the suitcases after "prepping" the bags by "press[ing] lightly with [the] hands and slowly circulat[ing] the air a little bit," with the goal of "procur[ing] a scent from the bag." *Id*. at 510. The Fifth Circuit held that the district court had properly denied the defendants' suppression motion, holding that this prepping procedure was not sufficiently intrusive to constitute a violation of the fourth amendment. *Id.*

I note that apart from *Caballes*–which was never contested by the parties in this appeal–*Viera* is the only case cited by the majority in support of its holding that defendant was not subject to a search, and, therefore, that the fourth amendment was not implicated in this case. The facts in *Viera*, however, are significantly distinguishable from the instant appeal: there, the "prepping" prior to the dog sniff was done by government agents; here, defendant was ordered to perform the set-up procedure prior to the dog sniff. In addition, defendant contends that the continued viability of *Viera* is placed in question by the subsequent decision of the United States Supreme Court in *Bond v. United States*, 529 U.S. 334 (2000). In *Bond*, the Court held that a bus passenger had an expectation of privacy in a bag placed in an overhead bin, and that a police officer's physical manipulation of the bag violated that privacy expectation and constituted an illegal search. *Id*. at 338-39. The majority addresses neither *Bond* nor defendant's contention.

In sum, under the facts presented, it is my view that the order to defendant to engage in the set-up procedure was an additional seizure which was unreasonable under the fourth amendment.

For the foregoing reasons, I respectfully dissent from the majority opinion.

JUSTICES BURKE and THEIS join in this dissent.