# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Graves, 2012 IL App (4th) 110536**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRUCE GRAVES, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0536 |
| Filed | January 31, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence to five years' imprisonment for aggravated driving under the influence of alcohol was affirmed over his contentions that the trial court erred in having a blanket policy against re-cross-examination, admitting an officer's testimony and opinions on horizontal gaze nystagmus, limiting defense counsel's cross-examination on non-alcohol-related nystagmus, allowing the State to replay a videotape admitted in evidence during closing argument, allowing the State to argue that defendant's refusal to take a breath test was an indication that defendant knew he was over the legal limit, limiting defendant's closing arguments, and sentencing him to prison rather than imposing probation. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 09-CF-1051; the Hon. Richard P. Klaus, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

James A. Martinkus (argued), of Erwin, Martinkus & Cole, Ltd., of Champaign, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and Anastacia R. Brooks (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE McCULLOUGH delivered the judgment of the court, with opinion.
Justice Cook concurred in the judgment and opinion.
Justice Appleton specially concurred, with opinion.

**OPINION**

¶ 1  On April 6, 2011, a jury found defendant, Bruce Graves, guilty of aggravated driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(d)(1)(A) (West 2008)). The trial court sentenced him to five years in prison. Defendant appeals, arguing the court erred by (1) having a blanket policy against re-cross-examination, (2) permitting police officer testimony and opinions regarding horizontal gaze nystagmus (HGN), (3) limiting defense counsel's cross-examination regarding non-alcohol-related nystagmus, (4) permitting the State to replay a videotape admitted into evidence during its closing argument, (5) permitting the State to argue during closing that defendant knew he was over the legal limit of 0.08, (6) limiting defendant's argument during closing arguments, (7) admitting portions of a videotape that were obtained in violation of the eavesdropping statute (720 ILCS 5/14-1 through 14-9 (West 2008)) and in violation of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and (8) sentencing him to five years in prison rather than a term of probation. We affirm.

¶ 2  On June 19, 2009, the State charged defendant with aggravated DUI in violation of section 11-501(a)(2) of the Illinois Vehicle Code (Code) (625 ILCS 5/11-501(d)(1)(A) (West 2008)). It alleged defendant drove a motor vehicle while under the influence of alcohol and had twice previously committed violations of section 11-501(a) of the Code or similar provisions.

¶ 3  On December 22, 2009, defendant filed a motion to quash and suppress evidence. He alleged video and audio recordings had been made at the time of his arrest and maintained that recordings made after his arrest and while he was in the back of a squad car were inadmissible because they were recorded without his consent in violation of the eavesdropping statute. He also asserted statements he made during that time were inadmissible because they were made without the requisite *Miranda* warnings. Defendant

asked the court to quash and suppress those statements and recordings.

¶ 4　　On May 25, 2010, the trial court entered a docket entry, stating it had previously heard arguments on defendant's motion to quash and suppress and had taken the matter under advisement. The court then stated it denied the motion. The record on appeal does not contain a transcript of the hearing.

¶ 5　　On August 13, 2010, defendant filed a second motion to quash and suppress evidence. He challenged the same video and audio recordings. Defendant asserted the recordings were made without his knowledge and without the benefit of *Miranda* warnings. A docket entry shows, on August 23, 2010, the matter was called for a hearing on defendant's second motion to suppress and the trial court took the matter under advisement. No transcript of that hearing appears in the appellate record. On October 8, 2010, the court entered a docket entry, stating it denied defendant's motion and finding statements defendant made were voluntary and failed to implicate *Miranda*.

¶ 6　　On April 4, 2011, defendant's jury trial began. The State presented the testimony of three police officers. Its evidence showed Officer Kendric Walls was on routine patrol during the early morning hours of May 2, 2009, when he observed defendant driving. Walls testified he saw defendant fail to make a complete stop at a stop intersection and make a wide right turn that caused his vehicle to go into the oncoming lane of travel. Defendant's vehicle continued in the wrong lane for approximately 25 or 50 feet before going back into the correct lane. Walls continued to observe defendant and noted his vehicle again veered into the oncoming lane of traffic for approximately 50 feet before defendant turned into the driveway of his residence. Walls initiated a traffic stop. During the stop, he observed that defendant's eyes were bloodshot and he was sweating. Walls could also smell an odor of alcohol on defendant's breath. He stated defendant appeared confused when attempting to locate his insurance card and ultimately turned over a card that was expired.

¶ 7　　Officer Ryan Rich arrived on the scene along with his field training officer, Daniel Ward. Walls explained why he stopped defendant, reported his observations, and asked Rich and Ward to investigate further into whether or not it was safe for defendant to be driving. Rich began speaking with defendant and noticed defendant's eyes were bloodshot and he had an odor of alcohol on his breath. To determine whether defendant had any type of impairment, Rich asked him to perform three tests before exiting the vehicle. Rich requested defendant perform a finger touch test, which defendant completed with no problem. He then asked defendant to recite the alphabet, beginning with letter C and ending with letter Q. Rich testified defendant began the test correctly but incorrectly added an H after letter K and then continued too far into the alphabet, stopping at letter V rather than Q. For the final preexit test, Rich asked defendant to count backwards from 85 to 67. Defendant attempted the test but miscounted. Also, he could not recall the number he was supposed to stop at and, ultimately, was unable to complete the test.

¶ 8　　Rich next asked defendant to step out of the car to perform three standardized field sobriety tests. He asked defendant to perform an HGN test, characterized by a jerking of the eye when moving right to left. As a result of that test, Rich found indicators of impairment from alcohol. He next asked defendant to perform the walk-and-turn test. Rich testified

defendant failed to perform the test as directed in that he broke position, was off balance, began the test before being asked, stopped before finishing, took an incorrect number of steps, and made an improper turn. Finally, Rich asked defendant to perform a one-legged-stand test. Rich stated defendant also failed to complete this test as instructed. He noted defendant hopped around, raised both arms, and dropped his foot.

¶ 9   Based upon his training and observations, Rich concluded defendant was under the influence of alcohol and arrested him for DUI. Following the arrest, defendant was driven to jail and police conducted a 22-minute observation period. During that time, Rich read defendant the warning-to-motorist, describing the harsher penalties for refusing to take the Breathalyzer test. Rich asked defendant to submit to a breath test but defendant refused. He also asked defendant if he had been drinking and defendant replied "no, not at all." Rich testified that he had noticed an odor of alcohol on defendant's breath and that odor stayed with defendant for the entire time Rich was with him.

¶ 10  Officer Ward testified he was with Rich during the duration of Rich's investigation into whether defendant was impaired. He also observed defendant and noticed defendant had bloodshot eyes and "the extremely strong odor of an alcoholic beverage on his breath." Ward watched as defendant performed the field sobriety tests. He noted defendant immediately lost his balance during the walk-and-turn test. During that test, he also began walking before being instructed to do so, lost his balance on another occasion, improperly counted his steps, raised his arms away from his body for balance, and improperly turned. When defendant performed the one-leg-stand test, Ward observed that he raised his arms, leaned to the left, and began hopping to maintain his balance. Defendant also had to place his foot down during the test. Ward testified he had substantial training in detecting when a person was under the influence of alcohol and he agreed with Rich's decision to arrest defendant.

¶ 11  The State also played a video for the jury, containing video from Walls' squad car immediately prior to and after he initiated the traffic stop of defendant's vehicle and video from Rich's squad car that showed defendant performing the preexit and field sobriety tests. The video also contained approximately one minute of footage of defendant after he was arrested and placed in the back of the squad car. The footage of defendant in the squad car did not contain any audio recordings.

¶ 12  Following deliberations, the jury found defendant guilty of the charged offense. On May 6, 2011, defendant filed a motion for a new trial and raised multiple issues. On May 24, 2011, the trial court conducted a hearing and denied defendant's motion for a new trial. It then conducted defendant's sentencing hearing. The court noted defendant's presentence investigation report, showing defendant had prior convictions for 17 traffic offenses, 5 misdemeanor offenses, and 2 felony offenses. The report also showed he had previously served two sentences of probation and one prison sentence in the Illinois Department of Corrections (DOC). The court sentenced defendant to five years in prison.

¶ 13  On June 13, 2011, defendant filed a motion to reconsider his sentence. He argued the trial court should have imposed a sentence of probation because (1) he was not a threat to the public, (2) a probation sentence would have been consistent with the interests of justice, and (3) a probation sentence would better serve both the public and defendant's rehabilitation.

Defendant also noted his strong family ties and his father's poor health. On June 17, 2011, the trial court conducted a hearing on defendant's motion. Although the record contains no transcript of that hearing, the court entered a docket entry, showing the appearance of all the parties and its denial of the motion.

¶ 14    This appeal followed.

¶ 15    On appeal, defendant first argues the trial court erred by refusing to permit re-cross-examination of the State's witnesses. He asserts the court had a blanket policy against re-cross-examination which caused him prejudice in that he was unable to challenge testimony about new matters brought up on redirect. Defendant maintains the court abused its discretion and he was denied a fair trial.

¶ 16    Challenges to a trial court's evidentiary rulings are subject to an abuse-of-discretion standard of review. *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 998, 874 N.E.2d 100, 109 (2007). "Clearly, the scope and extent of cross-examination and recross-examination are within the discretion of the court." *Adams*, 369 Ill. App. 3d at 998, 874 N.E.2d at 109 (citing *People v. Kirchner*, 194 Ill. 2d 502, 536, 743 N.E.2d 94, 112 (2000)). " '[C]ross-examination should be kept within fair and reasonable limits, and it is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere.' [Citation.]" *Adams*, 369 Ill. App. 3d at 998, 874 N.E.2d at 109.

¶ 17    Here, the State presented the testimony of three witnesses. Defendant attempted re-cross-examination with only one of those witnesses, Walls. At trial Walls testified on direct examination and cross-examination regarding his observations of defendant's driving, his initiation of a traffic stop, his observations of defendant during that stop, and his decision not to arrest defendant but to ask Rich to further investigate defendant's intoxication. During redirect, the State questioned Walls about turning the matter over to Rich and asked what field sobriety tests were. Walls responded that field sobriety tests tested a person's ability to multitask. The State then elicited testimony from Walls that field sobriety tests were part of the officers' investigation.

¶ 18    Following the State's redirect examination, defendant sought further inquiry. However, the trial court noted that re-cross was in its discretion and it typically would not allow re-cross-examination unless new ground had been covered by the State on redirect. The court denied defense counsel's request, finding it "heard no new ground." It permitted defendant to make an offer of proof outside of the jury's presence and defense counsel elicited agreement from Walls that field sobriety tests were designed to test matters such as coordination, physical stamina, the ability to follow directions, and balance. Walls also agreed that one's ability to perform such tests could be affected by factors other than being under the influence of alcohol.

¶ 19    Here, defendant mischaracterizes the trial court's re-cross-examination policy. Defendant argues the court had a blanket policy against re-cross-examination and failed to allow re-cross with respect to any of the State's witnesses. However, the record actually shows the court indicated it would permit re-cross-examination where new ground had been covered on redirect. The record further reflects defendant only sought to re-cross-examine one of the

State's three witnesses. As the State points out, defendant sets forth arguments with respect to only Walls' testimony and has failed to make any argument that new matters were brought about during redirect examination of either Rich or Ward.

¶ 20    Defendant has also failed to establish either an abuse of discretion by the court or prejudice. First, Walls testified during direct and cross-examination about his decision not to immediately arrest defendant and, instead, have Rich further investigate defendant's condition. The field sobriety testimony the State elicited from Walls on redirect concerned that further investigation. Second, the record shows Walls was not the officer who actually conducted defendant's field sobriety testing. Officer Rich was the individual who asked defendant to perform that testing and defense counsel fully cross-examined Rich regarding those tests. Moreover, he elicited from Rich the precise testimony he sought to elicit from Ward during re-cross-examination. We find no error on this basis.

¶ 21    Defendant next argues the trial court erred by permitting Officer Rich to testify and give opinions regarding HGN. He contends Rich's testimony lacked sufficient foundation under the legal standards set forth in *People v. McKown*, 236 Ill. 2d 278, 924 N.E.2d 941 (2010).

¶ 22    "Nystagmus is 'an involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties.' " *McKown*, 236 Ill. 2d at 284, 924 N.E.2d at 945 (quoting Dorland's Illustrated Medical Dictionary 1296 (30th ed. 2003)). In *McKown*, 236 Ill. 2d at 306, 924 N.E.2d at 957, the supreme court held that "evidence of HGN field-sobriety testing, when performed according to the [National Highway Transportation Safety Administration (NHTSA)] protocol by a properly trained officer, is admissible *** for the purpose of showing whether the subject has likely consumed alcohol and may be impaired." Further, a properly trained officer who followed proper procedures may give expert testimony regarding the results of the HGN test and "may use the HGN test results as a part of the basis for his opinion that the defendant was under the influence and impaired." *McKown*, 236 Ill. 2d at 306, 924 N.E.2d at 957.

¶ 23    Here, defendant asserts NHTSA protocol required Rich to check for resting nystagmus. He further maintains that, according to NHTSA standards, the presence of resting nystagmus renders an individual unsuitable for further HGN testing because it is indicative of a medical disorder or injury. Defendant contends Rich's testimony shows he did not know the difference between resting nystagmus and nystagmus that indicated alcohol consumption. He complains that Rich performed further HGN testing and formed opinions about defendant's alcohol consumption even after observing resting nystagmus. To support his position, defendant cites an NHTSA publication referenced in *McKown* entitled "DWI Detection and Standardized Field Sobriety Testing" (manual) (cited therein as DOT HS 178 R2/06) (see http://www.isp.state.il.us/docs/2006dwisfst.pdf). As noted in *McKown*, the manual devotes six pages to the subject of nystagmus and "outlines a 10-step procedure for performing a field test for HGN." *McKown*, 236 Ill. 2d at 296-97, 924 N.E.2d at 951-52 (citing DOT HS 178 R2/06, at VIII-7).

¶ 24    The manual defines nystagmus as an involuntary jerking of the eyes and states alcohol and certain other drugs cause HGN. DOT HS 178 R2/06, at VIII-3. It states HGN occurs as the eyes move to the side while resting nystagmus is defined "as a jerking of the eyes as they

look straight ahead." DOT HS 178 R2/06, at VIII-4. The manual notes that the presence of resting nystagmus "usually indicates a pathology or high doses of a Dissociative Anesthetic drug such as PCP." DOT HS 178 R2/06, at VIII-4.

¶ 25        The manual also provides the procedures for conducting the HGN field test. It provides that prior to administration of the test, an officer should assess an individual's possible medical impairment and states as follows:

> "Prior to administration of HGN, the eyes are checked for equal pupil size, resting nystagmus, and equal tracking (can they follow an object together). If the eyes do not track together, or if the pupils are noticeably unequal in size, the chance of medical disorders or injuries causing the nystagmus is present." DOT HS 178 R2/06, at VIII-5.

The manual instructs that there are then three clues to HGN testing: (1) lack of smooth pursuit, (2) distinct and sustained nystagmus at maximum deviation, and (3) onset of nystagmus prior to 45 degrees. DOT HS 178 R2/06, at VIII-5. It also provides details with respect to each clue. DOT HS 178 R2/06, at VIII-7. Finally, the manual lists specific procedures for officers to follow, including having the suspect remove eyeglasses, giving instructions from a safe position, and positioning the stimulus 12 to 15 inches from the suspect's nose and slightly above eye level. DOT HS 178 R2/06, at VIII-6.

¶ 26        First, defendant incorrectly sets forth the HGN testing protocol as stated in the manual he cites on appeal. While the manual provides that an officer should check for resting nystagmus, it indicates only that the presence of such "usually indicates a pathology or high doses of a Dissociative Anesthetic drug such as PCP." DOT HS 178 R2/06, at VIII-4. The manual does not state that an individual with resting nystagmus is unsuitable for further testing nor does it require that an officer cease further testing.

¶ 27        Second, a close review of Rich's testimony shows he was in compliance with NHTSA protocol as described in the manual when conducting the HGN test on defendant. Evidence at trial showed, at the time of defendant's arrest, Rich was a probationary officer and working under the supervision of Ward, his field training officer. Rich had recently been to the Police Training Academy, where he underwent approximately 12 hours of training on conducting DUI investigations and, in particular, field sobriety tests. He received training about the HGN test and had watched videos about the test, practiced performing the test, and observed the test performed in real life outside of his training. Rich testified his arrest of defendant was his first DUI arrest.

¶ 28        Rich further testified he had passed a practical skills exam for the nystagmus test. He described the HGN as "when the eye shimmys [*sic*] back and forth." He acknowledged that there was a standard way in which the HGN test was to be administered. Rich testified he first asked if the suspect had contacts. He then checked for equal pupil size. Rich noted than unequal pupil size could mean the suspect had a physiological disorder that could cause nystagmus.

¶ 29        Rich testified he was aware of something called resting nystagmus and defined it as "when the eye would go back and forth, left and right." Although Rich testified he was unsure how resting nystagmus differed from HGN, his further testimony shows he did, in fact, testify that his HGN testing included a check of whether the eyes jerked as they looked

-7-

straight ahead, *i.e.*, resting nystagmus. The following colloquy occurred between the State and Rich:

"Q. Okay. Do you check to see–you said nystagmus is a shaking of the eye. Is that right?

A. Yes.

Q. Do you check to see if the eyes do that without following a stimulus?

A. Yes.

Q. When do you do that?

A. While looking at it. Just while doing the pre-test.

Q. Okay. Officer, speak up.

A. Sorry.

Q. Okay.

A. While looking at to [*sic*] see if pupil size, you look to see if there's a resting nystagmus."

Rich went on to testify that he would then check for equal tracking of the eyes to see if they moved at the same pace. When actually performing the test, he looked for a lack of smooth pursuit, meaning any jerking while the eye moved left to right. Rich used his finger as the stimulus and positioned it 12 to 15 inches from defendant's face. He stated he next checked for nystagmus at maximum deviation, meaning the farthest that the suspect could look left or right, and held the eye in that position for four seconds. Finally, Rich testified he checked for nystagmus onset to 45 degrees.

¶ 30    Rich also testified he performed the HGN test on defendant in accordance with his training. He stated that, when performing the HGN test on defendant, *defendant's eyes jerked when looking straight ahead* and prior to being moved side to side. Rich went on to perform the remainder of the test and found defendant's eyes lacked smooth pursuit, jerked at maximum deviation, and shook prior to 45 degrees. Rich testified he determined from defendant's performance on the test that there were indicators that defendant was impaired from alcohol. Additionally, Ward stated he received training on conducting DUI investigations and learned how to perform the HGN and other field sobriety tests. He observed Rich conduct those tests in accordance with his training.

¶ 31    The trial court overruled defense counsel's foundational objections to Rich's HGN testimony. We note, "[t]he admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court [citations]." *Becker*, 239 Ill. 2d at 234, 940 N.E.2d at 1142. Here, the trial court committed no abuse of discretion in permitting Rich to testify regarding his HGN testing of defendant. As discussed, defendant mischaracterizes the NHTSA protocol he relies upon and the record shows Rich followed the proper procedures. Finally, we agree with the court's finding that defendant's objections to Rich's lack of knowledge about causes for

nystagmus other than alcohol or Rich's finding of resting nystagmus concern matters of the weight to be given Rich's testimony rather than matters of foundation and admissibility. See *Duncan v. State*, 699 S.E.2d 341, 345 (Ga. Ct. App. 2010) (finding the fact that an officer observed resting nystagmus before he administered the HGN test went to the weight of the evidence rather than to admissibility).

¶ 32    Additionally, we agree with the State that the evidence against defendant was overwhelming and any error would be harmless. "Error will be deemed harmless and a new trial unnecessary when 'the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result.' [Citation.]" *McKown*, 236 Ill. 2d at 311, 924 N.E.2d at 959.

¶ 33    Here, the State's evidence showed Walls initiated a traffic stop on defendant's vehicle after observing defendant fail to completely stop at a stop intersection, make a wide right turn, and twice drive in the oncoming lane of traffic. All three officers who testified for the State observed defendant with bloodshot eyes and an odor of alcohol on his breath. Defendant failed two preexit tests by incorrectly reciting a portion of the alphabet and being unable to count backwards as directed by Rich. Even excluding evidence of the HGN testing, evidence showed defendant failed two field sobriety tests due to his inability to follow directions and maintain proper balance. The jury had the opportunity to observe defendant's performance on video. This evidence was more than sufficient for the jury to find defendant guilty beyond a reasonable doubt and a new trial without evidence of HGN testing would not produce a different result.

¶ 34    On appeal, defendant next argues the trial court erred by limiting his cross-examination of Rich regarding non-alcohol-related nystagmus. He maintains he was prejudiced by the court's action because he was not permitted to challenge Rich's knowledge or lack of knowledge on that subject.

¶ 35    "The scope of cross-examination rests in the discretion of the trial court ***." *People v. Williams*, 317 Ill. App. 3d 945, 951, 742 N.E.2d 774, 779 (2000). "A court may limit cross-examination of a witness to prevent minimally relevant questioning or confusion of the issues." *People v. Lindmark*, 381 Ill. App. 3d 638, 659, 887 N.E.2d 606, 624 (2008) (finding no abuse of discretion in the limiting of cross-examination where the defendant attempted to introduce an issue during cross-examination without any evidence in support thereof). On review, "[d]efendant must demonstrate not only that the trial court abused its discretion but must also show the abuse of discretion resulted in 'manifest prejudice.' " *Lindmark*, 381 Ill. App. 3d at 659, 887 N.E.2d at 624.

¶ 36    During cross-examination, defense counsel elicited testimony from Rich that he did not know how many non-alcohol-related causes for nystagmus there were. Rich also acknowledged he did not know that nystagmus could be caused by the flu, vertigo, arterial sclerosis, muscular dystrophy, multiple sclerosis, hypertension, motion sickness, sunstroke, eye strain, eye muscle fatigue, glaucoma, caffeine consumption, nicotine consumption, or aspirin. Further, defense counsel elicited testimony that Rich did not know or remember the differences between alcohol-related nystagmus, nonalcohol nystagmus, rotational nystagmus,

caloric nystagmus, natural nystagmus, optokinetic nystagmus, or physiological nystagmus.

¶ 37 The trial court sustained the State's objection to defense counsel's inquiry into whether Rich could have mistaken, "for example," optokinetic nystagmus for nystagmus caused by alcohol consumption. It sustained a second objection by the State to defense counsel's question as to whether Rich knew the indicators for optokinetic nystagmus. During a side bar, the court asked whether defense counsel was "going to prove this up" and "the foundational basis" for his cross-examination.

¶ 38 Here, the record refutes defendant's contention that he was not permitted to challenge Rich's knowledge or lack of knowledge of the causes of nystagmus that are unrelated to alcohol. It shows defense counsel asked Rich numerous questions in that regard and elicited Rich's ignorance of the subject. Moreover, the trial court sustained the State's objections to only two questions, both relating specifically to optokinetic nystagmus. The record supports no connection between that specific condition and defendant. Again, as discussed, the evidence against defendant was more than sufficient to sustain his conviction and any error would be deemed harmless.

¶ 39 Defendant next argues the trial court erred in permitting the State to replay portions of the videotape introduced at trial during its closing argument, unduly emphasizing that evidence. He argues the court further erred by denying his request to replay the entire tape rather than have the State pick and choose which portions of the tape to play.

¶ 40 "[P]roperly admitted evidence may be displayed during closing argument." *People v. Forcum*, 344 Ill. App. 3d 427, 446, 800 N.E.2d 499, 514 (2003). More specifically, courts have found no error in the replaying of properly admitted videotaped or audiotaped evidence. See *People v. Gross*, 265 Ill. App. 3d 74, 77, 637 N.E.2d 789, 791-92 (1994) (Second District) (no error in the replaying of videotaped evidence where limited excerpts were played that comprised a small fraction of the entire tape and record and were presented to demonstrate inconsistencies); *Forcum*, 344 Ill. App. 3d at 446, 800 N.E.2d at 515 (Fifth District) (finding no error in the court allowing the State to replay a taped message and read portion of a letter during its closing argument where items had been admitted into evidence, jurors had the opportunity to examine the letter, and reading of the letter was accurate and constituted only a small portion of the State's closing argument). We review the trial court's decision to allow replaying of videotape evidence for an abuse of discretion. *Gross*, 265 Ill. App. 3d at 77, 637 N.E.2d at 791-92.

¶ 41 Here, the trial court allowed the State to replay portions of the videotape during its closing argument. The videotape had been properly admitted into evidence and only limited excerpts were played by the State. Also, the videotaped evidence constituted only a small part of the State's closing. Defendant complains that he was not permitted to replay the whole tape due to time constraints the court placed on closing arguments. However, the court limited closing arguments for both parties and stated defense counsel also had the option of replaying the videotape during closing argument. Although replaying the entire videotape would have taken up all of defense counsel's time for argument, defendant could have played only those excerpts helpful to his defense. Under the circumstances presented, we find no error.

¶ 42 On appeal, defendant further argues the trial court erred by allowing the State to make improper argument during closing. Specifically, he complains that the court permitted the State to argue, over objection, that defendant's refusal to take a breath test was proof that he knew he was over the legal limit.

¶ 43 Generally, the State is accorded wide latitude in the content of its closing arguments and it "may comment on the evidence and on any fair and reasonable inference the evidence may yield." *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009). "[E]vidence of a person's refusal to take a test designed to determine the person's blood-alcohol content is admissible and may be used to argue the defendant's consciousness of guilt." *People v. Johnson*, 218 Ill. 2d 125, 140, 842 N.E.2d 714, 723 (2005). However, argument is impermissible when it goes beyond this legitimate purpose and " 'blur[s] the distinction between the defendant's state of mind and the State's burden of proof ***.' [Citation.]" *Johnson*, 218 Ill. 2d at 140, 842 N.E.2d at 723. In *Johnson*, 218 Ill. 2d at 140-41, 842 N.E.2d at 723, the supreme court found argument "which implied that [the] defendant might have proven his innocence by submitting to a breath test" was "in conflict with the constitutional principle that a defendant is innocent until proven guilty."

¶ 44 Here, during closing, the State pointed out that police officers gave defendant the opportunity to submit a breath sample. It argued that defendant knew that if he submitted a breath sample and his blood-alcohol content was over the legal limit of 0.08 his license would be suspended for a period of time. The State further argued that defendant was told by police that, if he refused the breath test, his license would be suspended for a longer period of time. The State continued its argument, noting as follows: "[Defendant] chose the longer suspension. Why? Because he knew he would be over the legal limit." Finally, during rebuttal, the State argued as follows:

"We know that the Defendant refused to submit to chemical testing. I maintain that is because he knew he would be over the legal limit. He was told the ramifications of this. He chose not to submit that breath test."

¶ 45 Clearly, a prosecutor may argue that a defendant's refusal to submit to chemical testing shows consciousness of guilt and that is precisely what occurred in the present case. At trial, the State presented evidence that showed defendant refused to submit to a Breathalyzer test even though he had been informed by police that his refusal would result in a lengthier suspension period. During closing, the State argued defendant refused a breath test "because he knew he would be over the legal limit." Unlike in *Johnson*, the case relied upon by defendant, the State did not improperly shift the burden of proof to defendant by suggesting he missed the opportunity to prove his innocence by refusing the breath test. The facts presented are dissimilar from those presented in *Johnson* and the State's argument in this case was proper.

¶ 46 Defendant next argues the trial court erred by refusing to permit him to argue during closing argument that a person's age could affect performance on field sobriety tests. He maintains that the court's refusal to allow such argument was particularly harmful to his case because portions of the videotape that were played for the jury showed Rich, who was much younger than defendant, performing parts of the field sobriety testing as an example for

defendant.

¶ 47    The trial court has broad discretion with respect to limits placed on closing argument. *People v. Faria*, 402 Ill. App. 3d 475, 483, 931 N.E.2d 742, 750 (2010); *Lindmark*, 381 Ill. App. 3d at 659, 887 N.E.2d at 624 (noting "the trial court has the discretion to limit the character and scope of closing argument"). Here, the court committed no error.

¶ 48    First, the record refutes defendant's contention that the court refused to permit argument about age and its affect on field sobriety testing. Specifically, during closing, defense counsel argued without objection that it was unfair to compare the performances of 23-year-old Rich with the middle-aged defendant. Second, while the court sustained objections to argument about what defense counsel could have done when he was 23 years old and the general physical capabilities of a 23-year-old person, such argument was not relevant to defendant's particular situation and also concerned matters that were not in evidence. The trial court did not abuse its considerable discretion.

¶ 49    On appeal, defendant also challenges the trial court's denial of his motions to quash and suppress portions of the videotaped evidence that showed him in the back of a squad car following his arrest. He argues the videotape and accompanying audio recordings were obtained in violation of the eavesdropping statute and in violation of *Miranda*. He acknowledges that the videotape played at his trial contained only video recordings of him in the back of the squad car but, nevertheless, maintains the video is inadmissible because it "derived from an audio recording process in violation of the eavesdropping statute."

¶ 50    In the context of a motion to suppress, a circuit court's factual findings may be rejected only if they are against the manifest weight of the evidence. *People v. Bartelt*, 241 Ill. 2d 217, 226, 948 N.E.2d 52, 57 (2011). "[T]he circuit court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*." *Bartelt*, 241 Ill. 2d at 226, 948 N.E.2d at 57.

¶ 51    A person commits eavesdropping when he "[k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation" without the consent of all parties to the conversation. 720 ILCS 5/14-2(a)(1) (West 2008). The term "conversation" refers to "any oral communication between 2 or more persons." 720 ILCS 5/14-1(d) (West 2008). Certain activities are exempt from the provisions of the eavesdropping statute. 720 ILCS 5/14-3 (West 2008). At the time of defendant's arrest in May 2009, one such exemption included "[r]ecordings made simultaneously with a video recording of an oral conversation between a peace officer, who has identified his or her office, and a person stopped for an investigation of an offense under the Illinois Vehicle Code." 720 ILCS 5/14-3(h) (West 2008). Additionally, any evidence obtained in violation of the eavesdropping statute is inadmissible in a criminal trial. 720 ILCS 5/14-5 (West 2008).

¶ 52    Here, videotaped evidence of defendant's traffic stop included audio and video recordings of defendant while driving immediately prior to being stopped, immediately after he was stopped and performing various field sobriety tests, and immediately following his arrest while in the back of a squad car. As noted, defendant objected to the recordings of him in the police vehicle but his motions to suppress that evidence were denied. A portion of the videotape showing defendant in the back of a police vehicle was played for the jury. That video was edited down to approximately one minute of footage and had no accompanying

audio recordings.

¶ 53     Here, we find no violation of the eavesdropping statute. First, as the State points out, Walls informed defendant at the beginning of the traffic stop that he was being audio and video recorded. Defendant did not object to those recordings, giving his implied consent. See *People v. Ceja*, 204 Ill. 2d 332, 349, 789 N.E.2d 1228, 1240 (2003) (finding consent under the eavesdropping statute may be either express or implied). Defendant argues that his consent when initially stopped should not extend to the period of time after his arrest and when he was placed in the back of the squad car. However, the record reflects that all of the recordings occurred within a relatively short period of time and throughout the duration of the traffic stop. The recordings of which defendant complains began at the scene of the stop. Once defendant was aware that he was being recorded, there was no reason for him to believe that the recording had ceased. Under these circumstances, we find consent.

¶ 54     Additionally, the exemption found in section 14-3(h) of the eavesdropping statute applies to the facts presented. The record shows the audio recordings at issue were made simultaneously with video recordings, conversations on the recordings occurred between defendant and identified police officers, and defendant was stopped for investigation of an offense under the Code. Defendant argues that the exemption does not apply to postarrest recordings because the police were no longer conducting an investigatory stop. We disagree and find that defendant's arrest did not necessarily signal the end of the police officer's investigation.

¶ 55     Defendant also argues amendments made to section 14-3 after his arrest are relevant to show the statute was expanded to include previously "privileged" utterances such as those to which he now objects. Shortly after defendant's arrest, the eavesdropping statute's exemption provisions were amended to provide as follows:

    "(h) Recordings made simultaneously with the use of an in-car video camera recording of an oral conversation between a uniformed peace officer, who has identified his or her office, and a person in the presence of the peace officer whenever (i) an officer assigned a patrol vehicle is conducting an enforcement stop; or (ii) patrol vehicle emergency lights are activated or would otherwise be activated if not for the need to conceal the presence of law enforcement.

    For the purposes of this subsection (h), 'enforcement stop' means an action by a law enforcement officer in relation to enforcement and investigation duties, including but not limited to, traffic stops, pedestrian stops, abandoned vehicle contacts, motorist assists, commercial motor vehicle stops, roadside safety checks, requests for identification, or responses to requests for emergency assistance;

    (h-5) Recordings of utterances made by a person while in the presence of a uniformed peace officer and while an occupant of a police vehicle including, but not limited to, (i) recordings made simultaneously with the use of an in-car video camera and (ii) recordings made in the presence of the peace officer utilizing video or audio systems, or both, authorized by the law enforcement agency[.]" 720 ILCS 5/14-3(h), (h-5) (West 2010).

Defendant maintains there would have been "no cause to amend the statute to expressly add

-13-

language granting an exemption to utterances made while detained in a police vehicle if those same utterances were not privileged prior to the amendment."

¶ 56    To support his position, defendant cites legislative history, stating the amendment "expands the eavesdropping exemption." However, the entire portion of legislative history to which defendant refers states as follows:

"House Bill 1057 expands the eavesdropping exemption for simultaneous audio and video recordings by identified officers, requiring the audio recording to be made together with an in-car video camera, in the presence of the police officer whenever the officer reasonably believes recordings may assist with prosecution and enhance safety." 96th Ill. Gen. Assem., Senate Proceedings, May 20, 2009, at 62 (statements of Senator Hutchinson).

We find nothing in these comments that would preclude application of the preamended exemption at issue to the facts of defendant's case.

¶ 57    As discussed, defendant also challenged admission of the videotape on *Miranda* grounds. "However, *Miranda* warnings apply only to custodial interrogations." *In re Tyler G.*, 407 Ill. App. 3d 1089, 1092, 947 N.E.2d 772, 775 (2010). Here, although defendant was in custody, the record fails to reflect that he was being interrogated. As the trial court determined, the record shows defendant's statements while being recorded in the back of the squad car were voluntary and did not implicate *Miranda*.

¶ 58    Finally, on appeal, defendant argues the trial court erred in not considering probation and, instead, sentencing him to five years in prison. "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). On review, the imposed sentence will not be altered absent an abuse of discretion by the trial court. *People v. Hauschild*, 226 Ill. 2d 63, 90, 871 N.E.2d 1, 16 (2007). "We recognize that it is the function of the trial court to balance the relevant factors and make a reasoned decision as to the appropriate sentence, and we will not substitute our own judgment for that of the trial court." *People v. Rathbone*, 345 Ill. App. 3d 305, 313, 802 N.E.2d 333, 340 (2003).

¶ 59    Here, the record shows defendant had a significant criminal history, including 17 convictions for traffic-related offenses, 5 misdemeanor convictions, and 2 felony convictions. He had previously served two sentences of probation and one term of imprisonment in DOC. The trial court noted defendant's lengthy criminal history and that many of his convictions carried with them an indication of substance abuse. It also considered the circumstances surrounding the offense and, as a factor in mitigation, the poor health of defendant's father. Contrary to defendant's contention on appeal, the record does not show the court considered any matters not in evidence. Instead, the court appropriately weighed the evidence. It did not abuse its discretion.

¶ 60    Here, the record does not support defendant's contention that reversible error occurred during his trial or that the court abused its discretion during sentencing.

¶ 61    For the reasons stated, we affirm the trial court's judgment. We remand for issuance of a corrected sentencing judgment showing defendant's conviction with the correct statutory citation (625 ILCS 5/11-501(d)(1)(A) (West 2008)). As part of our judgment, we award the

State its $75 statutory assessment against defendant as costs.

¶ 62   Affirmed.

¶ 63   JUSTICE APPLETON, specially concurring:

¶ 64   I concur with the majority's result as to two issues for different reasons.

¶ 65   First, during the redirect examination of Officer Rich, the State exceeded the scope of its direct examination as well as the scope of cross-examination by defense counsel, without objection from defendant. The trial court's refusal to allow re-cross-examination concerning the new material brought forth during redirect was an abuse of discretion (see *People v. Williams*, 161 Ill. 2d 1, 44 (1994)) and a violation of defendant's right of confrontation (see *People v. Davis*, 185 Ill. 2d 317, 337 (1998)).

¶ 66   Upon denial of re-cross-examination, defense counsel made an offer of proof outside the hearing of the jury, which the court heard. Because the additional information elicited in the offer of proof concerned field sobriety testing and because the only "new" information on that topic from the redirect examination of Officer Walls was *de minimus*, I would find the technical error to be harmless beyond a reasonable doubt. See *Davis*, 185 Ill. 2d at 338.

¶ 67   Second, when the State replayed selected portions of the video of the roadside testing, it cherry-picked for maximum impact. Defense counsel sought leave to play the entire tape. The trial court agreed to permit defense counsel to do so but noted that the full tape would exhaust most of counsel's time for closing argument. Because the parties had agreed that each side would be allowed 30 minutes for closing arguments, defendant cannot now complain for opting to argue rather than replay the full tape recording.