# Illinois Official Reports

## Appellate Court

---

### *People v. Gomez*, 2018 IL App (1st) 150605

---

| | |
|---|---|
| Appellate Court Caption | PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDUARDO GOMEZ, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0605 |
| Filed<br>Rehearing denied | April 3, 2018<br>May 3, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-13389; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded in part. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael Gomez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Justice Mason concurred in the judgment and opinion.<br>Justice Hyman concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1     Following a bench trial, defendant Eduardo Gomez was convicted of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7 (a) (West 2014)), of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6 (West 2014)), and of unlawful use of a weapon by a felon (720 ILCS 5/24-1.1 (West 2014)). He was sentenced to three concurrent terms of seven years' imprisonment and assessed various fines, fees, and costs. On appeal, defendant argues that (1) the circuit court erred in denying his pretrial motion to suppress, (2) his aggravated unlawful use of a weapon conviction should be vacated, and (3) the fines, fees, and costs imposed by the circuit court should be reduced. For the reasons set forth herein, we affirm defendant's convictions for the offenses of armed habitual criminal and unlawful use of a weapon by a felon; however, we vacate his aggravated unlawful use of a weapon conviction. In addition, we remand the matter to the circuit court with instructions to modify its order assessing fines, fees, and costs.

¶ 2                             BACKGROUND

¶ 3     On July 3, 2014, following an encounter with several Chicago police officers, defendant was found to be in possession of a loaded firearm and was charged with multiple offenses, including armed habitual criminal, aggravated unlawful use of a weapon, and unlawful use of a weapon by a felon. After being taken into police custody, defendant admitted to possessing the firearm.

¶ 4     Prior to trial, defendant filed a motion to quash his arrest and suppress evidence, arguing that he was unlawfully detained and searched absent probable cause or a warrant in violation of his constitutional rights. As such, he contended that suppression of the firearm and his incriminatory statement was warranted.

¶ 5     The circuit court subsequently presided over a hearing on defendant's motion. At the hearing, defendant's friend, Frankie Baez, testified that at approximately 10:45 p.m. on July 3, 2014, he, defendant, and their mutual friend, Enriquez Salvador (Junior), were sitting in a parked vehicle located near the intersection of 52nd Street and Kildare Avenue. Baez explained that they were waiting for his girlfriend to join them. The vehicle in which they were sitting was owned by Junior's father, who operated a taxi company. Baez described the vehicle as a white "taxi car."[1] Junior was seated in the driver's seat of the vehicle, defendant was seated in the backseat directly behind Junior, and Baez was seated in the backseat next to defendant. While the three men were seated in the parked vehicle, an unmarked "cop car," containing three plain-clothes officers, pulled up alongside of them. The officers "flashed their lights" on the men, drew their weapons, and ordered Baez, Junior, and defendant to raise their hands and exit the vehicle. The three men complied. Baez testified that after he and defendant exited the vehicle, they placed their hands on opposite sides of the trunk. The officers then began searching them. As they were doing so, the officers heard a noise. Baez explained: "As they were searching us I guess they had like heard the noise of the firearm I guess fell on the floor and that's when they had right away put the flashlight all over [and] under the car and

_____

[1] Although Baez describes the vehicle as a taxi car, it is not clear whether or not the vehicle bore any signs or markings indicating that it was used as a taxi. As will be shown below, the detective who encountered the vehicle simply described it as a white Mercury Grand Marquis.

stuff." The officer who was closest to defendant then bent down and recovered a firearm from underneath the car. Baez testified that the officers did not present a search warrant or an arrest warrant for defendant at any time during the encounter.

¶ 6        On cross-examination, Baez acknowledged that defendant was a good friend whom he had known for several years. When asked additional details about the night in question, Baez admitted that the three men had been driving around the neighborhood in Junior's father's car for at least 40 minutes before stopping the vehicle on 52nd Street. He estimated that they were sitting in the parked vehicle for 10 to 15 minutes before the police officers arrived on the scene. Baez also acknowledged that when the officers pulled up alongside of Junior's father's car, the officers did not immediately exit their unmarked car and order the men to raise their hands in the air; rather, the officers remained seated in their vehicle and spoke to Junior while the windows of the two vehicles were rolled down and inquired what the three men were doing in the neighborhood that night. During the course of this conversation, Baez admitted that defendant started "scooting down in his seat," which was located right behind Junior's seat. Baez further admitted that defendant was hiding a gun in his waistband. In addition, he acknowledged that the officers exited their unmarked vehicle only after they observed defendant scooting down in his seat. The officers then ordered each of the men to show their hands. Although defendant complied with the officers' request and raised his hands, Baez admitted that defendant continued scooting down in the backseat until they were all ordered to exit the car. As Baez and his friends exited the vehicle, he heard one of the officers reference a noise, saying "What was that? What was that? What was that?" The officers then used their flashlights to illuminate the ground and recovered defendant's gun next to where defendant was standing. Baez, however, denied that he heard the sound of a gun dropping.

¶ 7        Following Baez's testimony, the defense rested, and defense counsel moved for a directed finding, which the circuit court denied. The State then called Chicago police detective Anthony Amato to testify. Detective Amato testified that on July 3, 2014, he was working with Sergeant Karczewski and Officer Daniel Pacelli. The three officers were wearing plain clothes and were riding in an unmarked police vehicle. Detective Amato, the driver of the unmarked police car, confirmed that at approximately 10:45 p.m. that evening, he and his partners encountered defendant, who was a passenger in a white Mercury Grand Marquis parked near the area of 4242 West 52nd Street. He explained that he had observed the vehicle on two prior occasions during a 30 to 40 minute period of time as he and his partners patrolled the area. During the previous two occasions that he observed the Grand Marquis, the vehicle was moving. On this occasion, however, the vehicle was parked facing westbound on 52nd Street. After observing the same vehicle for the third occasion in a short period of time, Detective Amato pulled up next to the vehicle and began speaking to the driver of the Grand Marquis through his open car window. He explained that he asked the driver "what he was doing, [and] if he lived around there." The driver initially responded that he lived down the street; however, when Detective Amato asked him to identify his "exact address," the driver admitted that he did not live down the street, but resided somewhere on the "other side of Pulaski."

¶ 8        As he spoke to the driver of the Grand Marquis, Detective Amato was able to observe defendant, who was seated directly behind the driver in the rear of the vehicle. When the conversation began, defendant was "seated upright" with his torso visible to the officers. As the conversation proceeded, however, defendant began "slouching down in the car. *** He just kept on like steadily slouching down as [the officers] were talking to the driver. So his head

was, you could only see like his head at one point in time." Detective Amato categorized defendant's behavior as "suspicious." Based on defendant's suspicious behavior and the driver's responses to his inquiries, Detective Amato and his partners exited their unmarked vehicle and approached the parked Grand Marquis. Detective Amato and Sergeant Karczewski walked to the driver's side of the vehicle while Officer Pacelli relocated to the passenger side of the vehicle. As Detective Amato stood by the driver's side of the Grand Marquis, he observed defendant leaning away from him and "toward the middle portion of the seat" with his right forearm covering the waistband of his pants. Defendant's right hand "was actually under his shirt." Detective Amato again found defendant's behavior to be "suspicious," and as a result, he asked to see defendant's hands. Initially, defendant only raised his left hand into the air and continued positioning his right arm and hand "along his waistband." He then "started showing his right hand," while still attempting to use his right forearm to shield the waistband of his pants. Based on his observations of defendant's behavior, Detective Amato "believed that [defendant] had a weapon on him" and ordered all three occupants of the Grand Marquis to exit the vehicle. Defendant and the two other men complied. As defendant was exiting the vehicle, he "still had his arm over his waistband." After he completely extricated himself from the car, however, he then immediately "turned around and he bent his entire body over the rear of the car." In response, Sergeant Karczewski "grabbed [defendant] by his arms and stood him upright." When he did so, a handgun dislodged from defendant's waistband and fell to the ground. Detective Amato immediately recovered the gun, which was loaded, and defendant was then placed into custody.

¶ 9     On cross-examination, Detective Amato categorized the area in which the Grand Marquis was parked as "residential." He could not recall whether there were any vehicles parked immediately in front of or in back of the Grand Marquis when he pulled up next to the vehicle. Detective Amato testified, however, that "we weren't blocking [the driver] in at that point in time. We were just having a conversation with him." During the conversation, he inquired whether the driver lived in the area. When the driver responded that he lived down the street, Detective Amato then requested the driver to identify his exact address. It was at that point that the driver admitted he did not live on the street and Detective Amato observed defendant begin slouching in his seat. Although he intended to ask for the occupants' identifications when he exited his unmarked car, Detective Amato did not recall whether he did so because his focus shifted to defendant slouching and leaning in his seat. At that point in time, he ordered all of the occupants out of the Grand Marquis "for safety reasons." Detective Amato conceded that he did not actually see a gun on defendant's person before he ordered defendant and the two other occupants of the Grant Marquis to raise their hands and exit the vehicle. He further conceded that defendant and the two other occupants of the Grand Marquis were not acting aggressively toward the officers before they were ordered out of the vehicle. Although he believed that defendant was in possession of a firearm, Detective Amato denied that he and his partners ever drew their weapons when defendant, Baez, and Junior exited the vehicle.

¶ 10     Following Detective Amato's testimony, the parties delivered closing arguments. After hearing the aforementioned testimony and the arguments of the parties, the court denied defendant's motion to suppress. In delivering its ruling, the court found that the encounter between police and the occupants of the Grand Marquis began as a "lawful" field interview, but that defendant's conduct "raise[d] things into question." The court explained: "He's not in the manner in which the other two occupants are. The way his hands were positioned, his arms

positioned, everybody is out of the vehicle he's bending over. He won't stand up. Finally he stood up. It wasn't a search. As [the officers] assisted him in standing up *** the weapon falls. There's no violation of [the] 4th amendment. *** There was probable cause. It was a proper stop. There was not any type of unlawful detention. Motion to suppress is denied."

¶ 11 Following the suppression hearing, defendant waived his right to a jury trial, and elected to proceed by way of a bench trial. At trial, the parties stipulated to the testimony that Detective Amato provided during the earlier hearing on defendant's motion to suppress. The State then called upon him to provide further testimony about the handgun that fell from the waistband of defendant's pants. Specifically, Detective Amato testified that when he recovered the handgun, he discovered that it was loaded and contained two live rounds. He further testified that after he recovered defendant's weapon, defendant "spontaneously" explained that he had just discovered the gun in a garbage can and asked the officers to "give [him] a break." At that point, defendant was advised of his *Miranda* rights and subsequently transported to the 8th District police station for questioning. After defendant arrived at the police station, Detective Amato and Sergeant Karczewski conversed with him. During that conversation, defendant admitted that he "was holding the gun for S.D.'s from 59th Street." Detective Amato understood defendant's reference to "S.D.'s" to mean the street gang known as Satan's Disciples.

¶ 12 Following Detective Amato's testimony, the State presented a series of stipulations reached by the parties. Specifically, the parties stipulated that defendant had previously been convicted of robbery and armed robbery. The parties further stipulated that defendant was on parole at the time he was found to be in possession of a firearm on July 3, 2014, and that he had not been issued a Firearm Owner's Identification (FOID) card. After presenting the aforementioned stipulations, the State rested its case-in-chief. Defendant moved for a directed verdict, but the motion was denied. Defendant elected not to testify and defense counsel rested without calling any witnesses.

¶ 13 After considering the evidence, the circuit court found defendant guilty of armed habitual criminal, aggravated unlawful use of a weapon, and unlawful use of a weapon by a felon. During the sentencing hearing that followed, the circuit court heard evidence submitted in aggravation and mitigation and ultimately sentenced defendant to three concurrent terms of seven years' imprisonment. The court also assessed a number of fines, fees, and costs. Defendant's posttrial motion was denied and this appeal followed.

¶ 14 ANALYSIS
¶ 15 I. Motion to Suppress
¶ 16 Defendant first argues that the circuit court erred in denying his motion to quash his arrest and suppress evidence. He argues that he was the victim of an unlawful seizure because police officers lacked reasonable suspicion that he was engaged in criminal activity at any time during their encounter. Defendant emphasizes that mere possession of a firearm is not a crime and contends that the officers had no reason to believe he was in unlawful possession of a firearm when they pulled up alongside of the vehicle in which he was seated and ordered him to raise his hands into the air and exit the vehicle.

¶ 17 The State responds that the circuit court "properly denied defendant's motion to quash arrest and suppress evidence because the consensual encounter was elevated to a *Terry* stop

[*Terry v. Ohio*, 392 U.S. 1 (1968),] based on reasonable suspicion that defendant was engaged in criminal activity."

¶ 18    As a general rule, a circuit court's ruling on a motion to suppress is subject to a bifurcated two-prong standard of review. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Pursuant to this standard, a reviewing court will afford great deference to the circuit court's factual findings and will disregard those findings only where they are against the manifest weight of the evidence. *Johnson*, 237 Ill. 2d at 88; *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17. The circuit court's ultimate legal finding as to whether suppression is warranted, however, is subject to *de novo* review. *People v. Colyar*, 2013 IL 111835, ¶ 24; *People v. Bartelt*, 241 Ill. 2d 217, 226 (2011). Accordingly, "[a] court of review 'remains free to engage in its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.' " *People v. Gherna*, 203 Ill. 2d 165, 175-76 (2003) (quoting *People v. Crane*, 195 Ill. 2d 42, 51 (2001)). When conducting this analysis, a reviewing court may consider the evidence presented at trial in addition to the evidence presented during the prior suppression hearing. *People v. Almond*, 2015 IL 113817, ¶ 55.

¶ 19    The right to be free from unlawful searches and seizures is protected by both the federal and state constitutions. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *Bartelt*, 241 Ill. 2d at 225-26. "The 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." *People v. McDonough*, 239 Ill. 2d 260, 266-67 (2010) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)). This constitutional guarantee "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). Not every interaction between police officers and private citizens, however, results in a seizure within the meaning of the fourth amendment. *Almond*, 2015 IL 113817, ¶ 56; *McDonough*, 239 Ill. 2d at 268. Courts evaluating the nature and propriety of police-citizen encounters have grouped those interactions into three tiers: (1) an arrest or detention of an individual supported by probable cause; (2) brief investigative stops, commonly referred to as "*Terry* stops," supported by a reasonable, articulable suspicion of criminal activity; and (3) consensual encounters involving neither coercion nor detention and do not implicate the fourth amendment. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006); *People v. Smith*, 2016 IL App (3d) 140648, ¶ 28.

¶ 20    For purposes of fourth amendment analysis, a person is considered seized when a law enforcement officer, " ' "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' " *Luedemann*, 222 Ill. 2d at 550 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991), quoting *Terry*, 392 U.S. at 19 n.16). More specifically, the relevant inquiry to determine whether an individual seated in a parked vehicle has been seized is whether a reasonable person in the defendant's position would have believed that he was free to decline the officer's requests or otherwise terminate the encounter. *Luedemann*, 222 Ill. 2d at 550-51; *Smith*, 2016 IL App (3d) 140648, ¶ 29; *People v. Bozarth*, 2015 IL App (5th) 130147, ¶ 15. Our supreme court has emphasized that this "test presupposes a reasonable *innocent* person." (Emphasis in original.) *Luedemann*, 222 Ill. 2d at 551 (citing *Bostick*, 501 U.S. at 438).

¶ 21 Relevant factors to consider when determining whether an individual was seized and not involved in a consensual encounter include: (1) the threatening presence of multiple officers; (2) the display of a weapon by an officer; (3) some physical touching of the individual's person; and (4) the use of language or tone of voice indicating that compliance might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J., joined by Rehnquist, J.); *Luedemann*, 222 Ill. 2d at 553. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *People v. Fields*, 2014 IL App (1st) 130209, ¶ 22. In addition to the four aforementioned *Mendenhall* factors, other factors that courts have "found indicative of a seizure of a parked vehicle are 'boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority.' " *Luedemann*, 222 Ill. 2d at 557 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 434-35 (4th ed. 2004)).

¶ 22 It is well-established, however, that a seizure does not occur simply because a law enforcement officer approaches and poses questions to an individual as long as that individual is willing to listen. *Gherna*, 203 Ill. 2d at 178 (citing *United States v. Drayton*, 536 U.S. 194, 200 (2002)); see also *Luedemann*, 222 Ill. 2d at 551. Indeed, even where an officer has no basis for suspecting an individual, he may nonetheless question that individual, request identification, and seek the individual's consent to search. *Bostick*, 501 U.S. at 434-35; *Gherna*, 203 Ill. 2d at 179; *Smith*, 2016 IL App (3d) 140648, ¶ 29. Importantly, "a confrontation with a police officer is not a seizure on the basis that the officer's authority produces an inherent pressure to cooperate. Rather, *** an encounter between a police officer and a civilian 'is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse.' " *People v. Castigilia*, 394 Ill. App. 3d 355, 358 (2009) (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 425 (4th ed. 2004)). Keeping the aforementioned factors and standards in mind, we address defendant's challenge to the circuit court's denial of his motion to suppress.

¶ 23 As a threshold matter, the parties dispute the timing of defendant's seizure. Defendant submits that he was subjected to an immediate seizure when Detective Amato first pulled up in his unmarked squad car alongside of Junior's vehicle, which was parallel parked on 52nd Street, and began asking Junior questions. The State, in turn, categorizes the initial encounter as consensual and posits that the encounter was only subsequently elevated to a lawful *Terry* stop when officers developed reasonable suspicion that criminal activity was afoot based on the totality of the circumstances, including "defendant's suspicious behavior."

¶ 24 Our analysis of the relevant factors does not support defendant's contention that he "was seized at the moment the officers pulled up next to the car." The record reveals that after Detective Amato observed Junior's vehicle in a residential neighborhood on three occasions in a 30-40 minute period of time, he pulled his unmarked squad car alongside of the parked vehicle. Although defendant contends that Detective Amato "blocked Junior's car into his parallel parking spot," the record does not contain any evidence as to how close Detective Amato's squad car was to Junior's car or whether there were other vehicles parked directly in front or in back of Junior's vehicle. Detective Amato, however, testified that Junior's car was not blocked in, and the circuit court expressly found that there was "no indication that they c[ould not] leave" the scene based on the positioning of the vehicles. Although defendant is

correct that a police encounter with a citizen in a parked car may be classified as a seizure where a police officer positions his car in a manner that "blocks" the parked car (see *Luedemann*, 222 Ill. 2d at 559), the record in this case simply establishes that the vehicles were positioned parallel to each other, not that the Grand Marquis was definitively blocked. Given the lack of evidence that the car in which defendant was sitting was boxed in, we cannot agree that defendant was seized from the moment that the officers arrived at the scene. We also reject defendant's argument that the conversation that ensued between Detective Amato and Junior after the officers pulled alongside of the parked vehicle was indicative of a seizure. The record establishes that after Detective Amato stopped his vehicle alongside Junior's car, he conversed briefly with Junior while the windows of both vehicles were lowered. Although Detective Amato was accompanied by two other officers at the time, none of the officers brandished weapons or physically touched defendant or any of the other occupants of the vehicles while he spoke to Junior. Moreover, there is no evidence that the tone and tenor of Detective Amato's voice when he posed several questions to Junior was forceful or coercive. Although defendant characterizes Detective Amato's questioning as "relentless" and "persistent," the record does not support that characterization. Rather, it appears that Detective Amato simply posed two general inquiries to Junior, asking him "what he was doing, [and] if he lived around there." After hearing Junior's responses, Detective Amato testified that he then posed one follow-up question, and requested Junior to identify his "exact address." We reiterate that a seizure does not occur simply because a law enforcement officer approaches and poses questions to an individual as long as that individual is willing to listen and the officers do not convey by their words or actions that compliance with their requests is required. *Luedemann*, 222 Ill. 2d at 551; *Gherna*, 203 Ill. 2d at 178-79. Accordingly, we find that defendant was not subject to an immediate seizure when Detective Amato stopped his squad car alongside of the parked Grand Marquis and asked Junior several questions, which he was willing to answer. *Luedemann*, 222 Ill. 2d at 552 ("[T]he mere approaching and questioning of a person seated in a parked vehicle does not constitute a seizure ***."); *Gherna*, 203 Ill. 2d at 179 ("[A]n individual is not seized for fourth amendment purposes when police ask questions of that individual, including a request for identification, so long as the officers do not convey by their words or actions to the person being questioned that compliance with their requests is required."). This does not end our inquiry, however, given that "a consensual encounter will lose its consensual nature if law enforcement officers convey a message, by means of physical force or show of authority, that induces the individual to cooperate." *Gherna*, 203 Ill. 2d at 179.

¶ 25    Indeed, defendant argues that even if the encounter did not constitute a seizure at the outset, it evolved into a seizure when Detective Amato and his partners exited their unmarked squad car and approached Junior's vehicle while illuminating their flashlights. The State concedes that defendant was ultimately seized,[2] but argues that the officers' conduct was lawful because the totality of the circumstances provided them with reasonable suspicion that criminal activity was afoot, and thus their actions were lawful pursuant to the United States Supreme Court's landmark decision in *Terry*, 392 U.S. 1.

¶ 26    At the hearing on defendant's motion to suppress, Detective Amato testified that the decision to exit the unmarked police car and approach the parked Grand Marquis was made

---

[2]Although the State acknowledges that defendant was seized, the State's brief is not entirely clear about the exact timing of the seizure.

after Junior acknowledged providing inaccurate information in response to his questions concerning Junior's address, and after observing defendant's body language while this conversation occurred. He explained that during the course of his short conversation with Junior, defendant, who was sitting directly behind Junior, began to slouch further and further down in his seat until only his head was visible. After making these observations, Detective Amato and his partners exited their vehicle and approached the parked Grand Marquis with the intention of requesting the occupants' identification cards. Specifically, Detective Amato and Sergeant Karczewski walked over to the driver's side of the vehicle while Officer Pacelli relocated to the passenger side of the vehicle. Although the officers approached with flashlights, the use of a flashlight is not *per se* coercive, especially where, as here, the police-citizen encounter took place at night and the flashlights were simply used to illuminate the scene. See *Luedemann*, 222 Ill. 2d at 561-65 (rejecting the defendant's argument that the officer's use of a flashlight when he approached the parked vehicle was coercive and constituted a seizure where the officer's use of a flashlight was simply "because it was nighttime"). Accordingly, we do not find that the officers' use of flashlights as they approached the Grand Marquis transformed the consensual encounter into a seizure.

¶ 27    Immediately after the officers approached the car, however, defendant began leaning way from the officers toward the center of the car and used his forearm to shield his waist from view. At that point, the officers ordered all of the occupants of the Grand Marquis to put their "hands up." When defendant did so in a manner that allowed him to continue to conceal his waistband, the occupants were then ordered to exit the vehicle. We find that the positioning of the officers around the vehicle, coupled with orders for the vehicle's occupants to put their hands up and to exit the vehicle, constituted a show of force and authority, which transformed the consensual encounter to a seizure. See, *e.g.*, *Gherna*, 203 Ill. 2d at 179-80 (finding that occupants of a parked vehicle were seized when two bike officers positioned themselves on either side of a parked car, thereby restraining the movement of the car's occupants and preventing them from either exiting the vehicle or driving away from the scene, and began putting questions to the occupants); *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 21 (finding that the officer's order to the respondent to " 'put his hands up' " constituted "a show of authority" indicative of a seizure); *Luedemann*, 222 Ill. 2d at 557 (recognizing that " 'the mere approach and questioning of [persons seated within parked vehicles] does not constitute a seizure. *** [However,] the encounter becomes a seizure if the officer orders the suspect to "freeze" or to *get out of the car*.' " (Emphasis added.) (quoting 4 Wayne R. LaFave, Searches & Seizures § 9.4(a), at 433 (4th ed. 2004))).

¶ 28    This does not end our inquiry, however, as we must next determine whether the seizure was reasonable. *Gherna*, 203 Ill. 2d at 181 ("[O]nly those seizures which are 'unreasonable' violate the fourth amendment."). In doing so, we necessarily address the State's argument that the seizure was reasonable under the standards set forth in *Terry*, 392 U.S. 1. In its *Terry* decision, the Supreme Court created a limited exception to the requirement that a seizure be supported by probable cause and held that a police officer "may conduct a brief, investigatory stop of a citizen [unsupported by probable cause] when the officer has a reasonable, articulable suspicion of criminal activity and such suspicion amounts to more than a mere 'hunch.' " *McDonough*, 239 Ill. 2d at 268 (citing *Terry*, 392 U.S. at 27). In articulating the reasonable suspicion standard, the court struck a balance between the need of law enforcement officials to exercise some flexibility when investigating potential criminal activity and the right of citizens

to be protected against unreasonable police interference in contravention of their fourth amendment rights. *Colyar*, 2013 IL 111835, ¶ 33 (citing *Terry*, 392 U.S. at 10-12). Pursuant to the reasonable suspicion standard, "[t]o justify a *Terry* stop, an officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' " *People v. Magallanes*, 409 Ill. App. 3d 720, 725 (2011) (quoting *Terry*, 392 U.S. at 21). Whether an investigatory stop is reasonable is judged by an objective standard, and only the facts known to the officer at the time of the stop may be considered. *People v. Linley*, 388 Ill. App. 3d 747, 749 (2009); see also *People v. Sparks*, 315 Ill. App. 3d 786, 792 (2000) ("The fourth amendment requires some minimal level of objective justification for making the stop."). As a general rule, "[a] trained police officer is given a great deal of latitude in assessing the 'whole picture' based upon the totality of the circumstances, including considerations of modes or patterns of operation of certain kinds of lawbreakers and various practical, objective considerations in determining whether there is reasonable suspicion that a crime has been committed." *People v. Mata*, 178 Ill. App. 3d 155, 160-61 (1988) (citing *United States v. Cortez*, 449 U.S. 411, 419 (1981)).

¶ 29        Here, we find that based on the totality of the circumstances, Detective Amato and his partners had reasonable suspicion to suspect that criminal activity was afoot at the time they initiated the seizure. At the time the seizure was initiated—when the officers surrounded the Grand Marquis and began issuing orders to the occupants—the officers had made several observations.[3] Detective Amato explained that he had initially pulled alongside of the vehicle after he had noticed it in the neighborhood he was patrolling on three occasions during a short 30-40 minute period. The vehicle had been mobile on the first two viewings, but was parked when he saw it for the third time. Upon encountering the vehicle for the third time, Detective Amato pulled up alongside of it and issued several questions to the driver, who was responsive to his questions. Although responsive, the driver admitted that he lied when he stated that he lived "down the street." During the course of this brief encounter, Detective Amato observed defendant slouch further and further down in his seat until only his head was visible. At that point, the officers exited their unmarked car and approached the Grand Marquis. Upon his approach to the driver's side of the car, defendant immediately leaned toward the center of the vehicle with his right hand inside his shirt and his right forearm covering his waist. Based on his years of experience as a police officer, Detective Amato found defendant's continued furtive movements to be suspicious and became concerned with officer safety. Although defendant correctly observes that his "actions did not lead to the inevitable conclusion that he had committed or was committing a crime," the *Terry* standard does not require an inevitable conclusion or absolute certainty; rather, it simply requires a reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 27; *McDonough*, 239 Ill. 2d at 268. In an effort to dispel his suspicions that criminal activity was afoot and in order to ensure officer safety, Detective Amato ordered defendant and the other occupants of the Grand Marquis to raise their hands into the air. When defendant did so in a manner that allowed him to continue concealing his waist, Detective Amato's suspicion that defendant was armed was strengthened, and he

---

[3] The record rebuts defendant's argument that he was seized "solely because [the officers] suspected he possessed a firearm." As such, we need not consider his argument concerning the propriety of a hypothetical *Terry* stop predicated solely on an officer's suspicion that a defendant was in possession of a firearm.

- 10 -

subsequently ordered defendant and the other occupants out of the Grand Marquis. The gun then fell to the ground when defendant exited the vehicle.[4]

¶ 30    Defendant emphasizes throughout his brief that mere possession of a firearm is not a crime and that the officers lacked reasonable suspicion that his possession of the firearm was unlawful until after the seizure occurred. Although it is true that simple possession of a firearm is not itself a crime, the fact that the officers were not aware of defendant's status as a convicted felon and parolee or his lack of a FOID card, which ultimately formed the basis for the specific criminal weapons charges filed against him in this matter, is not dispositive because defendant's furtive behavior and repeated efforts to conceal the weapon provided the officers with reasonable suspicion that defendant was not in lawful possession of the firearm. See *Mata*, 178 Ill. App. 3d at 160 ("To accept defendant's argument that the initial detention was invalid because the officer did not yet know the specific crime that had been committed would be directly contrary to the goals of *Terry* to encourage crime prevention and detection where there is reasonable suspicion that a crime has been committed."); see also *Colyar*, 2013 IL 111835, ¶ 49 (rejecting a defendant's argument that police officers are required to completely eliminate any legal explanation for a defendant's suspected possession of a firearm and establish that the defendant was committing a weapons offense before investigating further during a *Terry* stop). Any other result leaves police officers totally at the mercy of the citizens they encounter on a daily basis whose behavior raises concerns that they are armed.

¶ 31    Accordingly, we find that the circuit court did not err in denying defendant's motion to suppress.

¶ 32                    II. Aggravated Unlawful Use of a Weapon Conviction

¶ 33    Defendant next argues that his AUUW conviction must be vacated in light of our supreme court's decisions in *People v. Aguilar*, 2013 IL 112116, and *People v. Burns*, 2015 IL 117387, finding provisions of the state's prior AUUW statute unconstitutional.

¶ 34    The State agrees that defendant's AUUW conviction should be vacated but adopts a different rationale to support this result. Specifically, the State submits that defendant's convictions for AUUW and AHC are based on the same physical act—his possession of a loaded firearm—and thus violate the one-act, one-crime rule. Given that AUUW is the less serious offense, the State agrees that defendant's AUUW conviction should be vacated.

¶ 35    Because reviewing courts are duty-bound to avoid the adjudication of constitutional questions if an issue can be resolved on nonconstitutional grounds, we first address the State's one-act, one-crime argument. See *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort"). Pursuant to the one-act, one-crime rule, a defendant may not be convicted of more than one offense arising out of the same criminal act. *People v. King*, 66 Ill. 2d 551, 559-66 (1977); see also *Almond*, 2015 IL 113817, ¶ 47. For purposes of the one-act, one-crime rule, an "act" is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566.

---

[4]Defendant concedes that there was no search; rather, "the officers did not get to search [him] *** because the gun fell out of his pants as soon as one officer stood him up."

¶ 36    The AHC and AUUW statutes both criminalize a defendant's unlawful the possession of firearm. See, *e.g.*, 720 ILCS 5/24-1.7(a)(1) (West 2014) ("A person commits the offense of being an armed habitual criminal if he or she receives, sells, *possesses*, or transfers any firearm after having been convicted a total of 2 or more times of *** a forcible felony [such as robbery and armed robbery.]" (Emphasis added.)); 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2014) ("A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly: (1) *Carries* on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm *** and *** the firearm, other than a pistol, revolver, or handgun, possessed was uncased, loaded, and immediately accessible at the time of the offense[.]" (Emphasis added.)). Here, defendant's convictions for AHC and AUUW are both premised on his possession of a single loaded firearm, and as such violate the one-act, one-crime rule.[5] See, *e.g.*, *People v. West*, 2017 IL App (1st) 143632, ¶ 25 (finding that the defendant's AUUW and AHC convictions violated the one-act, one-crime rule because both convictions were based on the defendant's possession of a single loaded handgun). Where, as here, a one-act, one-crime violation is found, the proper remedy is to vacate the less serious offense. *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009). AHC is a Class X felony (720 ILCS 5/24-1.7(b) (West 2014)), whereas defendant's AUUW conviction is a Class 2 felony (720 ILCS 5/24-1.6(d)(3) (West 2014)). Because defendant's AUUW conviction is the less serious offense, we vacate that conviction. See *West*, 2017 IL App (1st) 143632, ¶ 25. In light of this ruling, we need not consider defendant's constitutional challenge to the Illinois AUUW statute. See *In re E.H.*, 224 Ill. 2d at 178.

¶ 37                                III. Monetary Assessments

¶ 38    Defendant next challenges the circuit court's order imposing various fines, fees, and costs. He first argues, and the State agrees, that he was improperly assessed a $5 electronic citation fee (705 ILCS 105/27.3e (West 2014)), a $5 court system fee (55 ILCS 5/5-1101(a) (West 2014)), and a $100 streetgang fine (730 ILCS 5/5-9-1.19 (West 2014)). We will address the propriety of each of the monetary assessments in turn.

¶ 39    As a threshold matter, we note that defendant failed to challenge the propriety of his assessments in the circuit court. Generally, a defendant's failure to challenge a sentencing issue in the circuit court through a contemporaneous objection and a postsentencing motion results in forfeiture of the claim on appeal. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 70; *People v. Reed*, 2016 IL App (1st) 140498, ¶ 13. The rules of forfeiture, however, are likewise applicable to the State. *Brown*, 2017 IL App (1st) 142877, ¶ 70; *Reed*, 2016 IL App (1st) 140498, ¶ 13. Given that the State has not raised any argument that defendant has forfeited his

---

[5]Defendant correctly observes that his unlawful use of a weapon by a felon (UUW) conviction was based on his possession of firearm ammunition, a separate act, and thus his convictions for AHC and UUW do not run afoul of the one-act, one-crime rule. See *Almond*, 2015 IL 113817, ¶ 48 (finding that the defendant's AHC and UUW convictions did not violate the one-act, one-crime rule because his AHC conviction was premised on his possession of a firearm whereas his UUW conviction was based on his possession of a firearm ammunition, explaining: "[T]he act of possession of a firearm is materially different from the act of possession of firearm ammunition, even if both items are possessed simultaneously.").

challenges concerning the propriety of his monetary assessments, we will address the merit of his claims. *Brown*, 2017 IL App (1st) 142877, ¶ 70. The propriety of a fines and fees order is subject to *de novo* review. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 60; *People v. Price*, 375 Ill. App. 3d 684, 697 (2007).

¶ 40    Defendant first argues that the circuit court erred in assessing a $5 electronic citation fee pursuant to section 27.3e of the Clerks of Courts Act (705 ILCS 105/27.3e (West 2014)) because he was not convicted of the specific offenses delineated in the statute. The State agrees that this fee was assessed in error and should be vacated. Section 27.3e of the Clerks of Courts Act provides for the payment of a $5 electronic citation fee by defendants "in any traffic, misdemeanor, municipal ordinance, or conservation case." 705 ILCS 105/27.3e (West 2014). Defendant was not found guilty of any of the specific type of qualifying offenses enumerated in section 27.3e of the Clerks of Courts Act. Accordingly, we direct the circuit court to vacate the $5 electronic citation fee.

¶ 41    We also find that the $5 court system fee was similarly improperly assessed. Like the aforementioned electronic citation fee (705 ILCS 105/27.3e (West 2014)), the court system fee may only be imposed under certain circumstances. Specifically, section 5-1101(a) of the Counties Code authorizes the fee when a defendant is convicted of violating the Illinois Vehicle Code or other similar municipal ordinance (55 ILCS 5/5-1101(a) (West 2014)). Because defendant was convicted of a criminal offense in contravention of the Criminal Code of 2012, the fee is inapplicable and we order it to be vacated. See, *e.g.*, *People v. Akins*, 2014 IL App (1st) 093418-B, ¶ 22 (vacating the $5 court system fee where the defendant was convicted of AUUW, a violation of the Criminal Code, and not a violation of the Illinois Vehicle Code or other similar municipal ordinance).

¶ 42    We also agree with the parties that the $100 streetgang fine was improperly levied against defendant. That fine, set forth in section 5-9-1.19 of the Unified Code of Corrections, provides:

> "In addition to any other penalty imposed, a fine of $100 shall be imposed upon a person convicted of any violation of the Criminal Code of 1961 or the Criminal Code of 2012 who was, at the time of the commission of the violation a streetgang member, as defined in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act." 730 ILCS 5/5-9-1.19 (West 2014).

Because the record contains no evidence that defendant was a streetgang member at the time of the offense, the imposition of the $100 streetgang fine was improper. See, *e.g.*, *People v. Smith*, 2015 IL App (1st) 132176, ¶ 34 (finding that the fine was improperly assessed where there was no evidence that the defendant was a member of a gang at the time he committed the offense). We thus order the circuit court to vacate this fine.

¶ 43    Defendant next argues that he is entitled to offset the fines imposed against him with his statutorily granted presentence incarceration credit.

¶ 44    Section 110-14(a) of the Code of Criminal Procedure of 1963 provides:

> "Any person incarcerated on a bailable offense who does not supply bail and against whom a *fine* is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant. However, in no case

shall the amount so allowed or credited exceed the amount of the *fine*." (Emphases added.) 725 ILCS 5/110-14(a) (West 2014).[6]

Pursuant to the plain language of the statute, however, a defendant's presentence incarceration credit may only be applied to fines, not fees. 725 ILCS 5/110-14(a) (West 2014); *People v. Johnson*, 2011 IL 111817, ¶ 8. A charge is considered a "fee" where it assessed in order to " 'recoup expenses incurred by the state,' or to compensate the state for some expenditure incurred in prosecuting the defendant." *People v. Graves*, 235 Ill. 2d 244, 250 (2009) (quoting *People v. Jones*, 223 Ill. 2d 569, 582 (2006)). A "fine," in contrast, is " ' "punitive in nature" ' and is ' "a pecuniary punishment imposed as part of a sentence on a person convicted of a criminal offense." ' " *Graves*, 235 Ill. 2d at 250 (quoting *Jones*, 223 Ill. 2d at 581). The label utilized by the legislature to describe the charge is not dispositive (*Jones*, 223 Ill. 2d at 583; *Brown*, 2017 IL App (1st) 142877, ¶ 73); rather, to determine the true nature of the charge, the "most important factor" to consider is "whether the charge seeks to compensate the state for any costs incurred as a result of prosecuting the defendant" (*Graves*, 235 Ill. 2d at 250).

¶ 45        In this case, defendant argues and the State agrees that the $10 mental health court assessment (55 ILCS 5/5-1101(d-5) (West 2014)), the $5 youth diversion/peer court assessment (55 ILCS 5/5-1101(e) (West 2014)), the $5 drug court assessment (55 ILCS 5/5-1101(f) (West 2014)), the $30 Children's Advocacy Center assessment (55 ILCS 5/5-1101(f-5) (West 2014)), the $15 State and Conservation Police operations (State Police Operations) assessment (705 ILCS 105/27.3a (West 2014)), and the $50 court system assessment (55 ILCS 5/5-1101(c) (West 2014)) are all fines subject to offset with presentence incarceration credit because they are all punitive in nature and not designed to compensate the State for expenses incurred in defendant's prosecution. We agree with the parties. Reviewing courts have construed the aforementioned assessments as fines rather than fees, which are subject to offset with presentence incarceration credit. See, *e.g.*, *Price*, 375 Ill. App. 3d at 701 (concluding that the mental health court and youth diversion/peer court assessments were fines rather than fees); *People v. Unander*, 404 Ill. App. 3d 884, 891 (2010) (holding that the $5 drug court assessment was a fine subject to offset with presentence incarceration credit); *People v. Jones*, 397 Ill. App. 3d 651, 660 (2009) (concluding that the $30 Children's Advocacy Center charge was a fine, not a fee); *People v. Maxey*, 2016 IL App (1st) 130698, ¶¶ 140-41 (finding that the $15 State Police Operations assessment was a fine subject to offset), *vacated by* No. 121137 (Ill. Nov. 22, 2017) (supervisory order); *Reed*, 2016 IL App (1st) 140498, ¶ 15 (construing the $50 court system assessment as a fine subject to offset).

¶ 46        In conclusion, we find that defendant was erroneously assessed the aforementioned $5 electronic citation fee, the $5 court system fee, and the $100 streetgang fine. We further find that the $10 mental health court assessment, the $5 youth diversion/peer court assessment, the $5 drug court assessment, the $30 Children's Advocacy Center assessment, the $15 State Police Operations assessment, and the $50 court system assessment may be offset by defendant's available presentence incarceration credit. We remand to the circuit court with

_____

[6]Defendant was arrested on July 3, 2014, and sentenced on January 28, 2015. He was thus incarcerated on a bailable offense for 209 days prior to being sentenced. We note that defendant correctly identifies the number of days in which was in custody prior to sentencing. The State's brief, however, erroneously states that defendant "was incarcerated on a bailable offense for 608 days before sentencing."

- 14 -

instructions to modify the fines, fees, and costs order in accordance with this disposition.

¶ 47                                    CONCLUSION

¶ 48     For the reasons explained above, we affirm defendant's armed habitual criminal and unlawful use of a weapon by a felon convictions; however, we vacate his aggravated unlawful use of a weapon conviction. We remand the matter to the circuit court for the limited purpose of modifying the fines, fees, and costs order.

¶ 49     Affirmed in part, vacated in part, and remanded in part.

¶ 50     JUSTICE HYMAN, concurring in part and dissenting in part:

¶ 51     I agree with my colleagues that Gomez's AUUW conviction should be vacated under the one-act, one-crime doctrine, and the fines and fees remanded for modification. But I disagree with the majority's conclusion that Gomez and his friends were not seized until the police ordered them out of the car. That seizure actually occurred when the police got out of their own unmarked car and approached Junior's car, despite the absence of specific, articulable facts that could give rise to reasonable suspicion of criminal activity.

¶ 52     The majority uses the correct standard as to whether a seizure has occurred: would a reasonable person have believed that he or she was free to leave or otherwise terminate the encounter? *People v. Luedemann*, 222 Ill. 2d 530, 551 (2006) (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).

¶ 53     The United States Supreme Court compiled a list of several factors that might indicate a seizure (though this is not an exhaustive list): (i) the threatening presence of several officers, (ii) a display of weapons, (iii) physical touching, or (iv) use of language or voice indicating that compliance is required. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J., joined by Rehnquist, J.). These factors were adopted by Illinois Supreme Court in *People v. Murray*, 137 Ill. 2d 382, 390 (1990). Several times, our supreme court has applied these factors in the context of police officers communicating with individuals who are inside a parked car. In *People v. Gherna*, the court held that two police officers on bicycles, one by the driver's door and one by the passenger's door, had "seized" the car by their positioning and their questioning about possible underage drinking. 203 Ill. 2d 165, 179-81 (2003). But in *People v. Cosby*, the court came to a different conclusion, holding that two officers, one on each side of the vehicle, did not seize it. 231 Ill. 2d 262, 278 (2008).

¶ 54     *Cosby* rather weakly distinguished *Gherna* because there was no additional evidence, other than the officers' positions, that the officers were attempting to "box in" the vehicle. *Cosby*, 231 Ill. 2d at 279-80. The weakness of this distinction is emphasized by the police officers' mode of transport: in *Cosby*, the two officers approached on foot, while the *Gherna* officers were riding bicycles. There is no logical argument that two bicycles are a better method of "boxing in" a vehicle than two officers on foot.

¶ 55     The majority states that the record "does not contain any evidence" as to whether any other vehicles were parked behind or in front of Junior's car. This is incorrect. Baez testified that Junior had parallel-parked his car, so when Detective Amato parked his car alongside Junior's, Junior could not drive away. While Detective Amato testified that he did not block Junior's car, he did not remember whether other cars were parked immediately in front of or behind

- 15 -

Junior's car. The trial court did not make any specific finding on this point, but merely stated that "the officer approached the vehicle in their vehicle parallel" (which is not in dispute) and "there's no indication that they can't leave" (which does not address the discrepancy between Baez's testimony and Amato's failure to recollect this detail). But we are to defer to factual findings, though this isn't much of a finding.

¶ 56 Even if we defer to the trial court's finding that Junior's car was not boxed in, that car was seized earlier than the majority concludes. Three officers approached Junior's car, on foot. Amato and Karczewski went to the driver's side, and Pacelli went to the passenger's side. This is a more effective "boxing in" than occurred in either *Gherna* or *Cosby*. The majority rejects the notion that using flashlights transformed the encounter into a seizure, but the flashlights were not necessary to make that transformation. The presence of three officers asking questions was sufficient enough that a "reasonable person" would not have felt free to drive away or terminate the encounter, particularly if moving the car even a few feet might have struck one of the officers. (And given recent unfortunate encounters between motorists and approaching police officers, even an unreasonable motorist might think that he or she does not have the freedom to end even a consensual encounter with police.)

¶ 57 The next question is whether Detective Amato had reasonable suspicion, at this point, to justify conducting the *Terry* stop. He testified that at the time he decided to get out of the car, his suspicion was based on three facts: (i) he had seen the vehicle driving around the neighborhood on two occasions earlier that evening; (ii) the driver (Junior) initially said that he lived "down the street" but then backtracked and said he lived on the other side of Pulaski; and (iii) he saw Gomez slouching down in the back seat.

¶ 58 The first of these is an utterly ludicrous basis for reasonable suspicion. Merely driving around a neighborhood over the course of an evening does not indicate or suggest criminal activity. If this was so, every car used by a neighborhood resident to run a couple of errands could be viewed by police as a predictor of criminal activity.

¶ 59 The second basis, although not ludicrous, also is insufficient in itself to suspect criminal activity. If this was in fact a "consensual encounter" (as the majority states that it was, at this point), then lying about, or being insufficiently clear about, one's address is not a crime. It could indicate criminal activity, but just as likely, it could indicate that a person had recently moved, was staying with friends, or was homeless. The same applies to the third point, Gomez's "slouching." One's posture is not an indication of criminal activity; nor, for that matter, is visible discomfort with police contact. Even if this police encounter was initially "consensual," no one in this situation thought that Amato had pulled up alongside Junior to have a friendly chat about the weather.

¶ 60 I believe the conclusion that the totality of the facts justifies the stop places undue confidence on Amato's foresight and relies on after-the-fact knowledge of the outcome, wrongly allowing hindsight to determine the lawfulness of the stop. I would hold that the motion to suppress should have been granted.